[Cite as *State v. Lacey*, 2012-Ohio-1685.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | CASE NO. 10 MA 122 |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| - VS - | ) | OPINION |
| | ) | |
| CHRISTOPHER LACEY, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:          Criminal Appeal from Common Pleas
                                                              Court, Case No. 09 CR 1150.

JUDGMENT:                                          Affirmed.

APPEARANCES:
For Plaintiff-Appellee:                          Attorney Paul J. Gains
                                                              Prosecuting Attorney
                                                              Attorney Ralph M. Rivera
                                                              Assistant Prosecuting Attorney
                                                              21 W. Boardman St., 6th Floor
                                                              Youngstown, OH  44503

For Defendant-Appellant:                    Attorney Rhys Cartwright-Jones
                                                              42 N. Phelps Street
                                                              Youngstown, OH  44503-1130

JUDGES:
Hon. Mary DeGenaro
Hon. Cheryl L. Waite
Hon. Joseph J. Vukovich

Dated:  March 29, 2012

DeGenaro, J.

{¶1} Defendant-Appellant, Christopher Lacey, appeals the decision of the Mahoning County Court of Common Pleas convicting him of felonious assault with a firearm specification and sentencing him accordingly. Lacey asserts four errors: First, the trial court admitted "other acts" evidence, and because counsel failed to object to this evidence or to file a pretrial motion in limine barring it, was ineffective. Second, the trial court allowed the State to preempt an African-American juror without providing a race-neutral reason. Third, his conviction is against the manifest weight of the evidence and is not supported by sufficient evidence. Finally, he argues that his conviction must be reversed due to cumulative error.

{¶2} Lacey's arguments are meritless. The evidence Lacey challenges as other acts was offered as proof of motive or does not constitute other acts evidence, such that no plain error or ineffective assistance occurred. The State offered a race-neutral reason for preempting the African-American juror, and the court did not err in overruling Lacey's *Batson* challenge. Lacey's conviction is supported by sufficient evidence and is not against the manifest weight of the evidence. Finally, since the errors Lacey claims are meritless, the doctrine of cumulative error does not apply. Accordingly, the judgment of the trial court is affirmed.

## Facts and Procedural History

{¶3} On October 29, 2009, Lacey was indicted by the Mahoning County Grand Jury for felonious assault (R.C. 2903.11(A)(2)(D)), a second-degree felony with a R.C. 2941.145(A) firearm specification. The matter proceeded to a jury trial on May 17, 2010. During voir dire, counsel for Lacey made a *Batson* challenge regarding the State's peremptory challenge of the only African-American juror, which the trial court denied.

{¶4} The State's first witness was the victim, Gary Robbins. He testified that he began using cocaine in the 80's and became addicted to cocaine, but he is currently sober. During his drug addiction, he had brushes with the law, including two convictions for drug possession, a forgery conviction, and a robbery conviction, which did not involve a gun. He also explained that he had a twin brother who also developed a drug addiction and was murdered by a drug dealer over $15.

**{¶5}** In August of 2009, he had periods of sobriety, but had a few relapses that month consisting of periods of binge usage. He testified that on August 18, 2009 around 10:00 p.m., he and a man he knew went to a drug house on Hudson Street on the south side run by "Teeny Weeny." Robbins testified that he was not familiar with the area, but the house was a known drug establishment. At the house, he bought and used some powder cocaine and crack cocaine. He then left the house and returned the morning of the 19th between 8-9:30 a.m. He explained that Lacey dealt drugs at the house, and he ran into one of Lacey's associates there. Before this incident, Robbins had seen Lacey before, but did not know who he was.

**{¶6}** Robbins testified that Lacey's associate had run out of drugs, so he and the man he knew took the associate to another place to obtain more drugs, and then they returned to Teeny Weeny's house. The associate gave them a little bit of drugs for transporting him. Robbins explained that he had a white SUV rental car at the time, which he let the associate use. The associate returned with his car around 1 p.m.

**{¶7}** Robbins explained that the house where Lacey stored his supply of drugs was located directly behind Teeny Weeny's house, and that Lacey was the head drug dealer with two or three other associates. Robbins stated that at this point, Lacey entered the drug house with his associates and that Lacey asked him to get them another vehicle. Robbins called Enterprise, went with Lacey and his associate to Enterprise and traded in the SUV for a black Mazda. Robbins drove them back to Teeny Weeny's house and he gave the keys to the associate. Robbins allowed them to use the car because "[Lacey's] associate left me some drugs to sell. I'm not a drug seller; I'm a drug user. In my estimation if you ever rent a car to a drug dealer, it's $10 an hour the going rate for letting somebody use the vehicle, $10 an hour. So I figure I messed with this gentleman's drugs. In order for me not to have any damage or physical harm to me, I said you could use this vehicle to pay off my debt for using your drugs."

**{¶8}** Robbins explained that the vehicle came and went and he noticed that Lacey was driving. At one point when Lacey returned with the vehicle, Robbins asked for it back because he felt he had paid his debt. He stated that Lacey ignored him and did

not return the car, so he spent the night at the drug house from the 19th into the morning of the 20th. He did not leave on his own because "I didn't know this guy, you know; I didn't know what his reputation was. But I know the streets in Youngstown, and I know how mean they are. And I know what these young drug dealers carry; they all carry weapons. So for my safety I just went with the flow."

{¶9} Robbins did not use drugs that night, and he estimated that the last time he used drugs was on the 19th was around 2:00 or 3:00 p.m. He estimated the effect lasted an hour or an hour and a half, and after that he was back to his normal senses. He further explained that cocaine makes him very aware but also paranoid, and that was why he was scared to say anything to Lacey because he was paranoid and he did not know what Lacey would do.

{¶10} Robbins testified that he slept at the drug house and woke up the next morning around 11 a.m. Right after he woke up, he went out the back door and saw his vehicle pull up with Lacey in it. Lacey went into his drug house, and Robbins was able to gain admittance after a man he knew introduced him to Lacey as "Twin."

{¶11} Inside, Robbins asked for his vehicle back, and Lacey responded that Robbins needed to pay for the drugs. Robbins testified that he said Lacey had had use of the vehicle for more than four hours. Robbins saw Lacey set the keys down on the countertop and go into the living room. Robbins told Lacey that he was going to the drug house, but he took his keys on the way out and got in the vehicle and pulled away.

{¶12} Robbins knew a man named Ernie who lived on Myrtle Street. He planned to use Ernie's phone to make a call to try to obtain money to pay double what he owed for the drugs so Lacey would not harm him. He explained why he was going to pay Lacey when he had already used the vehicle for over four hours: "These individuals will do anything to take advantage of you. They are gun-happy, trigger-happy individuals -- * * * -- with no value for life or anything."

{¶13} As Robbins was parking in Ernie's driveway, he saw a red car "flying" around the corner and into the driveway. He saw Lacey get out of the vehicle with a gun in his hand. He had seen a gun on Lacey at the stash house, but Lacey did not threaten

him with it then. Robbins explained that he then started his vehicle and put it in reverse. He was trying to escape from Lacey by driving through the lawn, but as he backed up, he ran into the back of the house.

**{¶14}** Robbins explained that his vehicle stalled, and then Lacey walked up, opened the driver's side door, and said "you try to play me on the car?" Robbins said no, and then Lacey fired three rounds; one into Robbins' leg; one into his rib cage that traveled into his stomach; and into his arm. Lacey then got in his vehicle and drove away. Robbins never lost consciousness during the encounter.

**{¶15}** At the scene a detective asked Robbins who shot him, and because he did not know Lacey's last name, he replied, "Chris shot me." Robbins said that there was a rush by the paramedics on the scene to get him to the hospital, so questioning by the detective at the scene was limited.

**{¶16}** Robbins was transported to St. Elizabeth Hospital where he had abdominal surgery. Detective Patton came to the hospital to show him a photo lineup a day or two, or as many as four days, after he had surgery. Robbins told the detective what had happened and he pointed to Lacey immediately in the photo lineup, at which point the detective told him that was Christopher Lacey. When asked if the photo he pointed to was the same person who shot him, Robbins replied, "Absolutely, without question. There's no doubt about it."

**{¶17}** Robbins testified at the October 7, 2009 preliminary hearing that he had identified the person who shot him and stated that it was Lacey. He said that initially he felt safe because he knew that Lacey was incarcerated; however, he was afraid for his life when Lacey was released on house arrest, especially since his brother had also been an addict, and was murdered by a drug dealer over $15.

**{¶18}** Robbins testified that he had heard that Lacey was looking for him, and he found out that Lacey was selling drugs while on house arrest at a house on Indianola Avenue. He decided to go to the house because if anything happened to him, he wanted it to be at that house where Lacey had a record of being on house arrest. When he went there, Lacey told him that he wanted him to talk to his attorney. Lacey said he would pay

Robbins with drugs and money if he dropped the case. Robbins testified that he did not want to drop the case, but he was talking to Lacey to find out why he wanted to see him. Robbins told Lacey that he would call Lacey's attorney and set up an appointment, which he did. However, he did not go.

**{¶19}** On March 19, 2010, Robbins was on the north side at the same location as one of Lacey's associates when Lacey arrived. Robbins testified that he was scared and he saw that the associate had a bulge in his shirt by his waistband, which Robbins thought was a weapon. He acknowledged that he did not actually see a weapon, but explained: "I've been in the streets a long time, and I know how these individuals carry their weapons * * *." He explained that he saw the same bulge on Lacey.

**{¶20}** Lacey told Robbins to call Lacey's attorney, and Robbins pretended that he already had but no one answered. Lacey said that his attorney was in the office and he just talked to him. Robbins and the associate got into Robbins's vehicle with the associate driving, and Lacey followed them. The associate said, "let's just ride", and Robbins agreed to go with them because he was scared. They went to a house on Idora Avenue, which Robbins later found out belonged to Lacey's mother. Lacey left his vehicle at the house, and Robbins got in the back seat of his vehicle and Lacey took his place in the front seat. They then drove to Attorney Meranto's office in Boardman.

**{¶21}** Lacey called the office from the parking lot and told the secretary that Robbins was coming in. It was well after 5:00 p.m. when Robbins went into the office, and Lacey and the associate stayed in the vehicle in the lot. Robbins explained that he knew Attorney Meranto from school. He spoke with the attorney about making a statement that Lacey had not shot him, that it was a case of mistaken identity, and signed an affidavit to that effect.

**{¶22}** Robbins knew that he would contact the prosecutor's office and tell them he was under duress, because he had no doubt that Lacey was the man who shot him. Robbins agreed to make this statement to Lacey's defense counsel only because he knew Lacey and his associate had guns even though he did not actually see them. He thought that if he did not make the statement, they would drive him somewhere else and

kill him. After signing the affidavit, he returned to the vehicle, and Lacey was talking to him like they were "best buddies." Robbins then got in the driver's seat and drove Lacey back to his house.

{¶23} Robbins went to the prosecutor's office on Monday morning, March 22, 2010, and also met with Detective Patton the next day and explained what happened on March 19. After several days passed, Robbins drove past Lacey's house because he wanted to find out if Lacey knew that he had spoken with the police about signing the affidavit under duress. Robbins saw a woman in the driveway and he pulled in and asked if Lacey was home. She said no, and he told her to tell Lacey that everything was okay and that Lacey was going to be all right.

{¶24} On cross, defense counsel questioned Robbins regarding inconsistencies in his testimony. Robbins clarified his earlier testimony regarding what transpired on August 18 and 19, 2009, specifically that the man he was with was named James, and that he had not previously testified that he had been with James nor told the police. However, he claimed that he told the prosecutor before the bond reduction hearing.

{¶25} The State stipulated that Robbins never mentioned the white SUV at the preliminary hearing on October 7, 2009. Robbins confirmed that he did not tell the police about the white SUV. He said he did not think it was relevant and he was not asked about it. He also explained that Lacey's associate sold drugs to him; Lacey never sold drugs to him. However, he later testified that he saw Lacey sell drugs to someone at Teeny Weeny's house.

{¶26} Robbins acknowledged inconsistencies in his testimony at the preliminary hearing and trial regarding the length of time he was sober before the shooting, and having been to the house on Indianola to see Lacey a few times. He said that he did not buy drugs from Lacey, but he knew Lacey was selling drugs out of the house because he saw Lacey sell someone drugs. Robbins claimed that he told the prosecutor that he observed this drug transaction, and he thought he told Detective Patton that Lacey was still selling drugs, although he did not specifically say that Lacey was selling drugs while on house arrest on Indianola.

**{¶27}** Regarding the day he signed the affidavit, Robbins testified that approximately two hours elapsed from the time he first saw Lacey until the time Robbins dropped Lacey off at home after leaving defense counsel's office. Robbins did not tell Attorney Meranto that he was signing the affidavit under duress because he was aware of attorney-client confidentiality. Robbins was surprised that the attorney did not say anything to him because the attorney knew that Lacey was not supposed to contact him. Robbins assumed Lacey called the office saying that Robbins was coming in, so the attorney would know that Lacey had been in contact with him. He thought his assumptions were correct since the attorney was still in his office past 5:00 p.m. on a Friday. Robbins explained that he did not tell Attorney Meranto to call the police regarding Lacey violating his bond by carrying a gun because he believed the attorney would do it himself since Robbins thought the attorney knew Lacey was violating his bond by contacting the victim. He explained that he did not call the police himself because he thought the detectives would not be in the office after 5:00 p.m.

**{¶28}** Robbins explained that he went to Lacey's house on Idora to see him because Robbins knew Lacey's mother lived there. He stated that Lacey's mother was in the driveway and Lacey's children were there, and he did not think that Lacey would shoot him in front of them. He said that he did not return to Lacey's house after that day and he did not knock on his door.

**{¶29}** On redirect, Robbins testified that he waited until Monday to contact the authorities regarding signing the affidavit because he wanted to talk to someone familiar with the case, not just any police officer. Robbins stated that when he gave his prior statements and testimony, he did not go into as much detail as he had on the stand, but "pretty much close to it."

**{¶30}** Robbins agreed that from August 18, 2009 until the time he was shot, he was not keeping track of time and was not wearing a watch. He agreed that he was estimating when he testified as to what times events happened. He also agreed that he was not keeping track of time on March 19, 2010 while he was with Lacey and his associate.

{¶31} On recross, Robbins stated that he did not tell defense counsel on March 19 that Lacey and his associate were in the parking lot with guns because they had drugs on them. Robbins explained that if the police came and Lacey and his associate disappeared and left the drugs in the vehicle, Robbins would have been charged with drug possession. Robbins stated that he had seen the associate with drugs but admitted that he did not mention that in his earlier testimony.

{¶32} The State then called Youngstown police officer John Aeppli. He was called to a shooting on August 20, 2009 and was the first officer to arrive. He saw paramedics working on Robbins in a car in the driveway. When he checked on Robbins, he noticed Robbins was bleeding from the chest and the leg.

{¶33} The State's third witness was Youngstown police officer Anthony Marzullo of the evidence collection unit. When he arrived on the scene, he went into the ambulance to get an ID for Robbins and asked what happened. Robbins replied that, "Chris that hangs at Teeny Weeny's had shot him." Officer Marzullo explained that he recovered two spent 9mm shell casings: one beside the vehicle and one by the house.

{¶34} The State then called Youngstown Police Detective John Patton. When he arrived at the scene, the ambulance had just left with Robbins. He spoke with Officer Marzullo who said that Robbins told him the shooter's name was Chris and he lived by or frequented Teeny Weeny's house.

{¶35} Detective Patton went to St. Elizabeth Hospital to talk to Robbins, but the conversation was brief because Robbins was being prepped for surgery. Robbins told him that Chris, who frequented Teeny Weeny's house on Hudson, had shot him. Detective Patton then returned to the station where he obtained Teeny Weeny's address and discovered police reports associated with it. He explained that after he reviewed the reports, he had "Lacey" as a possible last name for the suspect.

{¶36} He created a photo lineup using Lacey's driver's license photo. The detective then identified State's Exhibit 9 as the photo lineup he created. He explained that he took the photo lineup to St. Elizabeth Hospital on August 24, 2009. He testified that Robbins picked out Lacey's photo from the lineup. After that, they talked for 10 or 15

minutes about what happened, and he told Robbins to contact him when he got out of the hospital so the police could proceed with criminal charges against Lacey. Robbins signed charges against Lacey on September 15, 2009, and the detective took another statement from Robbins. He explained that he met with Robbins for around 30 minutes and they talked in more detail.

**{¶37}** In March of 2010, the detective spoke with the prosecutor, and then as a result, he had Robbins come in for an interview on March 23. During the interview, he asked whether Robbins was certain that Lacey was the shooter, and Robbins said yes. They then discussed Robbins filing the affidavit on March 19.

**{¶38}** On cross, Detective Patton testified that the statements Robbins made on September 15 and August 24 were substantially the same. The detective stated that Robbins told him he was at Teeny Weeny's house before the shooting, but he did not mention anything about drug use. The detective said that Robbins told him that he drove to Teeny Weeny's house and that he knew about the house. He confirmed that Robbins never mentioned a man named James or a white SUV. Robbins never told him about going to purchase drugs with individuals from Teeny Weeny's or the agreement to exchange the vehicle for drugs. Detective Patton agreed that had Robbins told him about those things, he would have extended his investigation.

**{¶39}** The detective testified that Robbins never told him that he contacted Lacey on several occasions. He confirmed that it was not common for the victim in a case to contact the defendant or vice versa. He agreed that there could be a potential problem if the defendant was contacting the victim, and he would take action if he heard about it, but he never heard that from Robbins.

**{¶40}** Detective Patton testified that when he interviewed Robbins on March 23, 2010 regarding the events of March 19, Robbins told him that Lacey's associate met him on the north side, and that they then picked up Lacey at his house on the south side. After that, they went to defense counsel's office. Detective Patton became aware that Lacey was on house arrest through Robbins's statement. He did not charge Lacey with intimidation of a witness. He stated that he did not do any further investigation, and he

did not contact the authorities in charge of Lacey's house arrest.

{¶41} On redirect, Detective Patton confirmed that he did not ask Robbins to go into detail about what he was doing the few days before the shooting. He agreed that he had encountered instances of contact between a victim and a witness before and had encountered instances of a defendant threatening a victim to keep him or her from testifying. He stated that when he interviewed Robbins on September 15, he showed him the photo lineup again and Robbins picked out Lacey.

{¶42} On recross, the detective agreed that the interview on September 15 was the "big interview" before he signed the charges. The detective confirmed that he told Robbins to tell him everything about that day.

{¶43} On the State's motion, the trial court admitted all nine exhibits, including the photo array, Exhibit 9 over objection. After the State rested, the defense moved for acquittal which was denied.

{¶44} The defense's first witness was Lacey's mother, Frances Lacey. She testified to two encounters she had with Robbins at her home. He had been looking for Lacey, who was not present either time.

{¶45} The next defense witness was Darla DeAngelis, who worked for Lacey's defense counsel and who stated that the latest she has stayed at the office was probably 5:30 p.m. On March 19, 2010, she stayed until 5:20 or 5:30 p.m. because she was waiting for Robbins to come so she could type an affidavit for him. She stated that Robbins had made a previous appointment that he did not keep.

{¶46} Robbins arrived after 5:00 p.m. and stayed for approximately 20 minutes. She testified that she can view the waiting room and saw that Robbins came in alone, and confirmed that defense counsel and Robbins were not alone at any point. She heard counsel tell Robbins that by signing the affidavit he was under oath, as if he were testifying in court, and that his statement had to be the truth. Robbins told her what to write in the affidavit, not defense counsel. When Robbins was finished, she printed it; Robbins reviewed it, said it was correct and signed it. She saw Robbins leave the office and she left after him, but when she got outside, he was gone. She did not see another

person or vehicle, and had no idea how Robbins came and left from the office.

{¶47} DeAngelis testified that she had checked her phone records, and Lacey had called the office at 3:00 p.m. on March 19. She explained that if counsel is in the office, she puts calls through to him; because she took a message, she believed that defense counsel was not there when Lacey called. On cross, she confirmed that her phone records were written records.

{¶48} The third defense witness was Jessica Brown, the house arrest officer for the Community Corrections Association. Her job entails placing people on house arrest and monitoring their whereabouts via ankle bracelets. Lacey had been on house arrest since December 14, 2009, and his ankle bracelet used a GPS system to monitor his location. Lacey had not been out of range significantly from December 14 to the beginning of the trial, and she explained that five minutes or less is not significant.

{¶49} While Lacey had been on house arrest, his bracelet had some equipment issues and it had been recalled twice for repairs. The model used for Lacey had had issues with the GPS signal being dropped, similar to a cell phone dropping a call, and signal drops are not normal. She was not aware of the signal being dropped because it did not register as an alert; the manufacturer informed her that the bracelet was recalled for repairs. She confirmed that there would be signal drops of a few minutes and she could not tell whether they were due to someone not charging the cord, the cord not charging properly, or the equipment itself. When asked if these signal drops were in periods of minutes, Brown responded that she could not confirm that because she did not receive that notification from the manufacturer.

{¶50} Brown confirmed that there had been an issue the day before with Lacey violating house arrest. She agreed that she was able to track Lacey's movements the day before and agreed that the CCA system works. Finally, she stated that the GPS showed that Lacey was home on March 19, 2010.

{¶51} On cross, Brown testified that Lacey's bracelet was changed twice: once at the end of February and once in the beginning of April. She confirmed that the bracelet she put on Lacey in April was currently functioning to the best of her knowledge. She had

spoken with Lacey regarding the problem the day before, and at first Lacey denied leaving the house, but later admitted it.

**{¶52}** On redirect, Brown agreed that she had told defense counsel that the problem with the ankle bracelet was that typically the GPS signal would drop for a few minutes and then it would go back on. Brown also testified that Lacey came for weekly checks to ensure his ankle bracelet was working properly.

**{¶53}** The defense rested and renewed its motion for acquittal, which was denied.

**{¶54}** The jury found Lacey guilty of felonious assault and the necessary finding for the firearm specification. The trial court sentenced Lacey to a three-year non-mandatory term of incarceration for the felonious assault conviction and a three-year mandatory consecutive term on the firearm specification, for an aggregate sentence of six years imprisonment. The court also imposed a mandatory period of post-release control for three years.

### Other Acts Evidence

**{¶55}** In his first of five assignments of error, Lacey asserts:

**{¶56}** "Plain Error and Ineffective Assistance: the trial court erred in allowing in multiple, prejudicial, and unsupported allegations of Mr. Lacey's bad character."

**{¶57}** Lacey claims that Robbins's testimony that Lacey was violent and a drug dealer was inadmissible as "other acts" evidence. First, he argues that his counsel was ineffective for failing to file a pretrial motion in limine barring this testimony or to object to this testimony at trial.

**{¶58}** To prevail on a claim of ineffective assistance of counsel, an appellant must satisfy the two-pronged test of *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. First, the appellant must establish that counsel's performance fell below an objective standard of reasonable representation. *Id.* Second, the appellant must demonstrate that he was prejudiced by counsel's performance. *Id.* To establish prejudice, an appellant must show there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.* at 694. The appellant bears the burden of proof. *State v. Calhoun* (1999), 86 Ohio St.3d 279, 289,

714 N.E.2d 905; *State v. Smith* (1985), 17 Ohio St.3d 98, 100, 17 OBR 219, 477 N.E.2d 1128.

**{¶59}** When evaluating an ineffective assistance of counsel claim, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland* at 689. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *State v. Bradley* (1989), 42 Ohio St.3d 136, 142, 538 N.E.2d 373. If an appellant cannot show how counsel's errors undermined the reliability of the court's decision, there is no basis for finding that appellant's right to counsel had been violated. *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, at ¶109; *Strickland*, at 693.

**{¶60}** We must first determine whether Robbins's testimony was inadmissible as other acts evidence under Evid.R. 404(B). "The focus of the inquiry into the admissibility of other-acts evidence is whether the evidence is being offered for the impermissible purpose of proving that the accused acted in conformity with his or her criminal character in committing the charged offenses, or whether the evidence is being offered for another purpose." *State v. Pearson* (1996), 114 Ohio App.3d 168, 185, 682 N.E.2d 1086. Because Evid.R. 404(B) and R.C. 2945.59 contain exceptions to the common-law rule that such other-acts evidence is inadmissible, both provisions must be construed strictly against the admissibility of such evidence. *State v. Broom* (1988), 40 Ohio St.3d 277, 533 N.E.2d 682, paragraph one of the syllabus.

**{¶61}** Lacey challenges the following testimony regarding his involvement with drug dealing:

**{¶62}** "He comes in with his associates. He was the head of this – his little crew. He had about two or three other guys that worked with him, but he was the head of it. He was the drug leader that sold the majority of the drugs." Lacey also asserts that since Robbins testified he did not buy drugs from Lacey, this testimony lacks an appropriate foundation. However, Robbins also testified that he observed Lacey sell drugs to a third party at both Teeny Weeny's house and at the house on Indianola.

**{¶63}** Lacey contends that evidence that someone is a drug dealer is inadmissible. The State contends that this evidence was properly used to show Lacey's motive for shooting Robbins. Ohio courts have held that evidence of a defendant's involvement in drug transactions may be admissible to prove motive. See *State v. McCuller*, 8th Dist. No. 83379, 2004-Ohio-3615, at ¶16-17; *State v. Hill* (1987), 37 Ohio App.3d 72, 74-75, 523 N.E.2d 894.

**{¶64}** Lacey and his associates sold drugs at Teeny Weeny's house. Robbins let them use his rental car in exchange for drugs. Robbins felt that Lacey had used his vehicle long enough and that his debt was paid, but Lacey did not agree and told Robbins that he still owed him for the drugs. Robbins took the keys to the vehicle and left the drug house; Lacey followed him and shot him in retaliation. This testimony establishes Lacey's motive for shooting Robbins; retaliation for Robbins failing to repay his drug debt to Lacey.

**{¶65}** Lacey counters that because felonious assault contains no element of motive, testimony that Lacey was a drug dealer is not admissible to prove motive. However, the Ohio Supreme Court has recognized that: "Since it is assumed that human conduct is prompted by a desire to achieve a specific result, the question of motive is generally relevant in all criminal trials, even though the prosecution need not prove motive in order to secure a conviction." *State v. Curry* (1975), 43 Ohio St.2d 66, 71, 330 N.E.2d 720.

**{¶66}** Because the testimony regarding Lacey's drug involvement was admissible as proof of motive, his counsel did not act deficiently by failing to file a motion in limine barring this testimony or to object to it at trial.

**{¶67}** Lacey also argues that Robbins's testimony describing Lacey as a violent person was inadmissible other acts evidence:

**{¶68}** "And I know what these young drug dealers carry; they all carry weapons."

**{¶69}** "These individuals will do anything to take advantage of you. They are gun-happy, trigger-happy individuals -- * * * -- with no value for life or anything."

**{¶70}** This testimony does not concern other acts evidence. The first statement

was made when Robbins explained why he did not leave the drug house after Lacey ignored his requests to return his vehicle; he did not want to confront Lacey. Robbins made a general statement that he knew drug dealers carry guns. While his statement implied that Lacey had a gun, it is a general description of drug dealers rather than another act or crime committed by Lacey. The second statement explained why Robbins was willing to pay Lacey double the amount he owed him for the drugs. While this statement describes Lacey's character negatively, it is a general statement regarding drug dealers; it is not other acts testimony.

**{¶71}** Since the testimony Lacey challenges does not constitute other acts evidence, Lacey's counsel did not act deficiently in failing to file a pretrial motion in limine or object to this testimony on the grounds that it was inadmissible under Evid.R. 404(B).

**{¶72}** Lacey next argues that the trial court erred when it admitted Robbins's testimony. He correctly limits his analysis to plain error review, as his counsel did not object to the testimony at trial.

**{¶73}** An appellate court does not have to resolve an alleged error if it was never brought to the attention of the trial court "at a time when such error could have been avoided or corrected by the trial court." *State v. Carter* (2000), 89 Ohio St.3d 593, 598, 734 N.E.2d 345. In the absence of objection, this court may only examine the court's actions for plain error. *Id.* Plain error should be used "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240. A claim of plain error does not stand unless, but for the error, the outcome of the trial would have been different: "[t]he test for plain error is stringent. A party claiming plain error must show that (1) an error occurred, (2) the error was obvious, and (3) the error affected the outcome of the trial. *State v. Davis,* 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, at ¶378.

**{¶74}** Robbins's testimony that Lacey was involved with drug dealing was admissible as proof of motive, and that Lacey is a violent person is not inadmissible other acts evidence. Thus, the trial court did not commit error, let alone plain error in admitting the evidence. For all these reasons, Lacey's first assignment of error is meritless.

## *Batson* Challenge

**{¶75}** In his second assignment of error, Lacey argues:

**{¶76}** "*Batson v. Kentucky*: the trial court erred in allowing the state to preempt an African American juror absent articulation of a rational basis for preemption from the state."

**{¶77}** A prosecutor violates the Equal Protection Clause of the United States Constitution when she uses peremptory challenges to purposefully exclude members of a minority group because of their minority status. *Batson v. Kentucky* (1986), 476 U.S. 79, 85-86, 106 S.Ct. 1712; *State v. Bryan,* 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433. Courts analyze a *Batson* claim in three steps: 1) the opponent of the peremptory challenge must make a prima facie case of racial discrimination; 2) the party making the peremptory challenge must present a racially neutral explanation; and, 3) the trial court must decide whether the opponent has proved a purposeful racial discrimination. *Batson* at 96-98; *State v. Herring* (2002)*,* 94 Ohio St.3d 246, 255-56, 762 N.E.2d 940.

**{¶78}** When a trial court evaluates the attorney's explanation, "a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law." *Hernandez v. New York* (1991), 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395. Appellate courts review *Batson* determinations with great deference, and a trial court's findings of no discriminatory intent will not be reversed unless clearly erroneous. *Hernandez* at 365; *Bryan* at ¶106.

**{¶79}** A race-neutral explanation for a peremptory challenge is simply "an explanation based on something other than the race of the juror." *Hernandez* at 360. "[T]he prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause." *Batson* at 97. The explanation must relate to the particular case being tried and be both clear and reasonably specific. *Batson* at 98, fn. 20. Although some relevancy is required of the explanation, it does not need to be "'persuasive, or even plausible': so long as the reason is not inherently discriminatory, it suffices." *Rice v. Collins* (2006), 546 U.S. 333, 338, 126 S.Ct. 969, 163 L.Ed.2d 824, quoting *Purkett v.*

*Elem* (1995), 514 U.S. 765, 767-768, 115 S.Ct. 1769, 131 L.Ed.2d 834. See, also, *Hernandez* at 360 ("Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.").

{¶80} The parties in this case agree that Lacey made a prima facie case of racial discrimination. The court questioned the juror, Mr. G., as follows:

{¶81} "Q: And you also had a little brush with the law. Do you mind telling me about that?

{¶82} "A: That's correct. I had – it was back in 2003. I had a pill box with OxyContin in it.

{¶83} "Q: And did you have a trial in that or did you plead?

{¶84} "A: I plead in Drug Court.

{¶85} "Q: Okay. You successfully completed Drug Court?

{¶86} "A: That's correct."

{¶87} * *

{¶88} "Q: Thank you for your honesty. Do you want to sit on this jury.

{¶89} "A: May I ask to be excused, Your Honor, due to the recent murder of my cousin?

{¶90} "Q: What happened? Your cousin was murdered?

{¶91} "A: Yes. I think it was in the – I think I wrote it on the paper.

{¶92} * *

{¶93} "Q: Just hang out with me for one minute; okay? Anything else you need to tell me?

{¶94} "A: No ma'am. That would be it."

{¶95} The State further questioned Mr. G. as follows:

{¶96} "Q: * * * The fact that this is a shooting, not a murder case, of course, is that going to bother anyone in any way or make it so they can't be fair and impartial?

{¶97} "A: (Indicating).

{¶98} "Q: Mr. [G], I was going to talk to you about that a little later, but let's talk now. Your cousin was [H.C.]?

**{¶99}** "A: Yes.

**{¶100}** "Q: * * * Has anyone been arrested for that?

**{¶101}** "A: Yes.

**{¶102}** * *

**{¶103}** "Q: Okay. Have you ever gone to court when there's been pretrials or anything?

**{¶104}** "A: (Nodding head).

**{¶105}** * *

**{¶106}** "Q: You've gone to court just to support part of the family?

**{¶107}** "A: (Nodding head).

**{¶108}** "Q: Okay. The fact that he was shot, the fact that the victim was shot three times in this case – and I'm not asking you if you're going to be uncomfortable. I'm sure you would be. But do you think it's the type of thing you wouldn't be able to be fair?

**{¶109}** "A: I would be fair, you know, based on the evidence presented, but it's just that feeling still there.

**{¶110}** * *

**{¶111}** "Q: Okay. Just because of what happened to your cousin, would you feel that – do you think you could still give Mr. Lacey a fair trial?

**{¶112}** "A: Yes.

**{¶113}** "Q: Do you think you could still give the state a fair trial.

**{¶114}** "A: Yes."

**{¶115}** * *

**{¶116}** "Q: Now, you told us you had a theft offense in your past. You went through Drug Court, so the case was dismissed. When you went through Drug Court, you pled guilty then; correct?

**{¶117}** "A: Correct.

**{¶118}** "Q: So you admitted your guilt. * * * [W]e've already talked about the murder case with your cousin. Your feeling is it's not that you can't be fair. It's just that's weighing too much on your mind?

**{¶119}** A: That's correct.

**{¶120}** "Q: The facts might be a little close here, the fact that this is a shooting. It's not that you can't do it; it's just that you prefer not to do it?

**{¶121}** "A: That's correct. It just brings up those thoughts.

**{¶122}** "Q: Okay. But if you are chosen to stay on the panel if the state proves beyond a reasonable doubt the defendant is guilty, would you be able to find him guilty?

**{¶123}** "A: That's correct. I would be fair."

**{¶124}** The State later excused Mr. G. through a peremptory challenge. The defense raised a *Batson* challenge in response. The State then presented its reasoning for exercising its peremptory challenge:

**{¶125}** "Mr. [G] stated on the record his cousin was shot and killed less than a year ago. That case is still going through this court, not before this judge but still in this county. He has gone to court from time to time for pretrials and things like that, and that's very much on his mind. It would be very difficult for him to perform his duties as a juror. Correct, he did not say that he wouldn't be fair and impartial because of that, but it would make it very difficult for him.

**{¶126}** "Also, Mr. [G] stated – it was on his questionnaire, and we talked about it in court – he has committed and did plead guilty to a theft of drug charge. However, that was of course dismissed because he completed the Drug Court program. But it does show that he does have a criminal background, although no conviction."

**{¶127}** The State's explanation for excusing Mr. [G] was race-neutral and supported by the record. Mr. [G]'s relative was the victim of a crime similar to Lacey's, and he indicated that he preferred not to serve on the jury. Although Mr. [G] ultimately agreed that he could be impartial, he initially asked to be excused from the jury and indicated that he could not be impartial. Thus, the State's reasoning for excluding Mr. [G] from the jury was based upon his relative's murder and his feelings of discomfort with serving on a jury, not upon race. See *State v. Baer*, 7th Dist. No. 07 HA 8, 2009-Ohio-3248, at ¶76. Moreover, Mr. [G] had pled guilty to a theft offense, which was eventually dismissed when he completed the Drug Court program. "Removing a juror based on the

past criminal history of him or her, or his or her family member, is a valid, race-neutral reason for raising a peremptory challenge." *State v. Santiago*, 10th Dist. No. 02AP-1094, 2003-Ohio-2877, at ¶10.

{¶128}  Lacey argues that the State's failure to excuse a Caucasian juror who also recently had a death in her family demonstrates the State's reasoning was pretextual. "[A] prosecutor's explanation for striking an African-American juror does not pass muster where a similarly situated Caucasian juror was not stricken."  *State v. Belcher* (1993), 89 Ohio App.3d 24, 33-34, 623 N.E.2d 583.

{¶129}  The record reveals significant differences between Mr. [G] and the other juror's responses during voir dire.  The Caucasian juror, Ms. [B], lost a family member from natural causes, not murder.  Furthermore, Ms. [B] brought up her father's death as something that was weighing on her mind "a little bit," but she concluded that she did not have a problem serving as a juror and when asked if she would be able to give the trial her attention, she responded, "Absolutely, yes."  Unlike Mr. [G], Ms. [B] did not ask to be excused from the jury nor did she indicate in any way that she might not be able to be impartial.

{¶130}  Lacey also notes that the State argued that Mr. [G] had to go to court at times to attend pretrials, which is inaccurate since only the defendant and defense counsel has to attend a pretrial.  However, Mr. [G] testified that he attended these pretrials to support his family, not that he was obligated to attend them.  The State mentioned the pretrials to show that the murder case was ongoing and weighing heavily on Mr. [G]'s mind.  Lacey further argues that while the State mentioned Mr. [G]'s involvement with the Drug Court as part of its explanation for preemption, he had a clean record and was able to sit on a jury.  However, a juror's criminal past is a valid, race-neutral reason for preemption.

{¶131}  The State provided a valid, race-neutral explanation for excluding Mr. [G] from the jury, and the trial court did not err in overruling the *Batson* challenge. Accordingly, Lacey's second assignment of error is meritless.

**Manifest Weight**

{¶132} Lacey asserts in his third assignment of error:

{¶133} "Manifest Weight: The manifest weight of the evidence supported acquittal."

{¶134} When reviewing a judgment under a criminal manifest weight standard of review, "[t]he court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717.

{¶135} This court's discretionary power to reverse on manifest weight grounds and grant a new trial is exercised only in the exceptional case where the evidence weighs heavily against conviction. *Thompkins* at 387. This standard is a high one because the trier of fact was in a better position to determine credibility issues, by having personally viewed the demeanor, voice inflections and gestures of the witnesses. *State v. Ali,* 154 Ohio App.3d 493, 2003-Ohio-5150, 797 N.E.2d 1019, at ¶36; *State v. DeHass* (1967), 10 Ohio St.2d 230, 231, 39 O.O.2d 366, 227 N.E.2d 212. A reviewing court therefore should not interfere with the witness credibility and factual determinations of the jury, unless the record demonstrates that a reasonable juror simply could not have found the witness to be credible. *State v. Mock,* 187 Ohio App.3d 599, 2010-Ohio-2747, 933 N.E.2d 270, at ¶40.

{¶136} Lacey was convicted of felonious assault with a firearm specification. "No person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." R.C. 2903.11(A)(2).

{¶137} Lacey argues that no physical evidence connects him to the shooting. He notes that Robbins signed an affidavit stating that Lacey did not shoot him. And despite Robbins's claim that he signed the affidavit under duress, Lacey was at home during the time Robbins claims that Lacey accompanied him to defense counsel's office.

{¶138} The jury did not lose its way so as to create a manifest miscarriage of

justice. While Robbins did sign the affidavit, which weighs against his credibility, he consistently identified Lacey as the shooter before and after signing this affidavit. He identified Lacey as the shooter to Officer Marzullo on the scene, and he reaffirmed this identification to Detective Patton in the hospital. Robbins also picked Lacey out of the photo lineup on August 24, 2009 and then again on September 15, 2009. After he signed the affidavit on March 19, 2010, Robbins contacted the prosecutor's office, and he told the detective on March 23, 2010 that he was certain Lacey was the shooter. Furthermore, Robbins identified Lacey as the shooter under oath at the preliminary hearing on October 7, 2009 and at the trial.

{¶139} Lacey challenges Robbins's claims that he signed the affidavit under duress because Lacey's GPS ankle bracelet showed that he was at home on the date that Robbins signed the affidavit. Brown testified about technical problems with Lacey's ankle bracelet and that the manufacturer recalled it twice during Lacey's time on house arrest. Although Brown testified that the GPS signal drops were typically only minutes long, ultimately, she could not confirm that the signal drops for Lacey's ankle bracelet were minutes long. A reasonable jury could believe that Lacey drove with Robbins to defense counsel's office given the testimony about the problems with the ankle bracelet. "A jury is free to believe all, part, or none of the testimony of each witness who appeared before them." *State v. Helman*, 7th Dist. No. 03 CO 55, 2004-Ohio-4867, at ¶12. Even if the jury did not believe that Lacey actually accompanied Robbins to the office, it could still believe Robbins's testimony that he signed the affidavit under duress and his identification of Lacey as the shooter.

{¶140} Lacey also challenges Robbins's credibility. Specifically, Lacey contends that Robbins contradicted himself by testifying about James and the white SUV for the first time at the trial. Robbins did not mention details of the events leading up to the shooting in his earlier testimony or during his discussions with the detective. For example, Detective Patton testified that Robbins never mentioned that he went with James to the drug house or that he originally drove a white SUV. The detective also testified that Robbins did not mention drug use or the agreement to exchange the vehicle

for drugs.  While this weighs against Robbins's credibility, it does not render his testimony completely unbelievable.   James and the white SUV were not directly related to the shooting.  The jury could have found it reasonable that Robbins would go into more detail while on the stand.  Since determinations of witness credibility are "primarily for the trier of fact," *State v. Funkhouser*, 7th Dist. No. 02-BA-4, 2003-Ohio-697, at ¶8, and Robbins consistently identified Lacey as the shooter before and after signing the affidavit, Lacey's conviction was not against the manifest weight of the evidence.  Accordingly, Lacey's third assignment of error is meritless.

### Sufficiency of the Evidence

**{¶141}**  In his fourth assignment of error, Lacey argues:

**{¶142}**  "Sufficiency: the state failed to establish the identity element of the offense."

**{¶143}**  "Sufficiency of the evidence is the standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the jury verdict."  *State v. Smith* (1997), 80 Ohio St.3d 89, 113, 684 N.E.2d 668.  Thus, sufficiency is a test of adequacy.  *Thompkins* at 380.  Whether the evidence is legally sufficient to sustain a verdict is a question of law.  Id.  In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.  *Smith* at 113.

**{¶144}**  Lacey argues that because Robbins did not identify Lacey of record during the trial, the evidence was insufficient to prove the identity element of the offense: that Lacey was the shooter.  Lacey points to the following exchange between the State and Robbins during trial:

**{¶145}**  "Q: On October 20th, 2009, you were shot three times, once in the leg, once in the side, once in the arm?

**{¶146}**  "A: Correct.

**{¶147}**  "Q: Is the person that did that, the person that shot you, present in court today?

{¶148} "A: The individual seated over at the defendant's table, Chris Lacey, is the one that shot me (indicating).

{¶149} "Q: Are you positive?

{¶150} "A: Absolutely positive."

{¶151} Lacey argues the exchange was insufficient because the State did not say, "Let the record reflect that the witness has identified the defendant, Lacey" and the court did not reply, "So reflected." He contends the reason for this dialogue is that many people could be at the defense table, such that without this confirmation on record, it is unclear who the witness actually identified.

{¶152} Robbins testified that four days after the shooting, he identified Lacey in a photograph lineup while he was in the hospital. He further testified that he identified Lacey as the person who shot him at the preliminary hearing on October 7, 2009. Detective Patton identified State's Exhibit 9 as the photographic lineup he prepared and showed to Robbins on August 24, 2009. He explained that he instructed Robbins that the suspect may or may not be in the photo lineup and if Robbins saw the subject to point to him. The detective confirmed that Robbins picked out Lacey. When asked if he influenced Robbins to pick Lacey's photo, Detective Patton replied, "I wouldn't have had time, that's how fast he picked him out." This is sufficient evidence of identity so that a rational trier of fact could have found this element proven beyond a reasonable doubt. Accordingly, Lacey's fourth assignment of error is meritless.

### Cumulative Error

{¶153} Lacey asserts in his fifth and final assignment of error:

{¶154} "Multiple instances of error, combined, caused, reversible error in Mr. Lacey's case."

{¶155} Under the doctrine of cumulative error, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of the errors does not individually constitute cause for reversal. *State v. Garner* (1995), 74 Ohio St.3d 49, 64, 656 N.E.2d 623. However, the doctrine of cumulative error is inapplicable when the alleged errors are found to be harmless or

nonexistent.  *Id.*; *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, at ¶48.  Because the other four assignments of error are meritless, the cumulative error doctrine does not apply.  Accordingly, Lacey's final assignment of error is meritless.

### Conclusion

**{¶156}**  The evidence Lacey challenges as inadmissible other acts evidence was offered as proof of motive or does not constitute other acts evidence, and its admission was neither error nor plain error.  As these evidentiary issues are the basis of Lacey's ineffective assistance claim, that assignment of error likewise is meritless.  The State offered a race-neutral reason for preempting the African-American juror; thus, the court did not err in overruling Lacey's *Batson* challenge.  Lacey's conviction is supported by sufficient evidence and is not against the manifest weight of the evidence.  Finally, since the errors Lacey claims are meritless, the doctrine of cumulative error does not apply.  Accordingly, the judgment of the trial court is affirmed.

Waite, P.J., concurs.

Vukovich, J., concurs.