[Cite as *State v. Jones*, 2024-Ohio-2959.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    v.

JOSHUA JONES,

    DEFENDANT-APPELLANT.

CASE NO. 1-23-17

O P I N I O N

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    v.

JOSHUA JONES,

    DEFENDANT-APPELLANT.

CASE NO. 1-23-18

O P I N I O N

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    v.

JOSHUA JONES,

    DEFENDANT-APPELLANT.

CASE NO. 1-23-19

O P I N I O N

Appeals from Allen County Common Pleas Court
Trial Court Nos. CR 2022-0271, CR 2021-0224 and CR 2021-0353

Judgments Affirmed in Case Nos. 1-23-17 and 1-23-18
Appeal Dismissed in Case No. 1-23-19

Date of Decision:  August 5, 2024

**APPEARANCES:**

*Kimberly E. Burroughs* **for Appellant**

*John R. Willamowski Jr.* **for Appellee**

**ZIMMERMAN, J.**

{¶1} Defendant-appellant, Joshua Jones ("Jones"), appeals the March 30, 2023 judgment entries of sentence of the Allen County Court of Common Pleas. For the reasons that follow, we affirm appellate case numbers 1-23-18 and 1-23-17 and dismiss appellate case number 1-23-19.

{¶2} On July 14, 2021, the Allen County Grand Jury indicted Jones in case number CR2021 0224 on Count One of domestic violence in violation of R.C. 2919.25(A), (D)(5), a fifth-degree felony, and Count Two of having weapons while under disability in violation of R.C. 2923.13(A)(3), (B), a third-degree felony. On July 22, 2021, Jones filed a written plea of not guilty to the indictment.

{¶3} On November 10, 2021, the Allen County Grand Jury indicted Jones in case number CR2021 0353 on a single count of domestic violence in violation of R.C. 2919.25(A), (D)(5), a fifth-degree felony. On November 19, 2021, Jones appeared for arraignment and entered a plea of not guilty to the indictment in case number CR2021 0353.

{¶4} On May 16, 2022, Jones filed a motion in case number CR2021 0224 requesting that the trial court "continue trial in this case or to bar the State from any additional charges out of this incident" based on the anticipation that "the State would be considering additional charges based upon the suspected controlled substances, but that has not yet occurred, nearly a year later, due to unexplained delays with the State laboratory." (Case No. CR2021 0224, Doc. No. 53). In response to Jones's motion, the trial court on May 20, 2022 granted Jones's request to continue the May 21, 2022 trial in case number CR2021 0224.

{¶5} Subsequently, on September 15, 2022, the Allen County Grand Jury indicted Jones in case number CR2022 0271 on four counts (stemming from the conduct originating in case number CR2021 0224): Count One of possession of marihuana in violation of R.C. 2925.11(A), (C)(3)(d), a third-degree felony; Count Two of possession of cocaine in violation of R.C. 2925.11(A), (C)(4)(a), a fifth-degree felony; and Counts Three and Four of aggravated possession of drugs in violation of R.C. 2925.11(A), (C)(1)(b), third-degree felonies. The indictment in case number CR2022 0271 also included a firearm specification under R.C. 2941.141(A) as to the counts. On September 20, 2022, Jones filed a written plea of not guilty to the indictment in case number CR2022 0271.

{¶6} As relevant to this appeal, on September 21, 2022, Jones filed a motion in case number CR2022 0271 requesting that the trial court dismiss the firearm specifications in that case. Similarly, on September 27, 2022, Jones filed a motion

to dismiss case number CR2022 0271 for violating his speedy-trial rights. On October 19, 2022, as relevant here, the State filed memoranda in opposition to Jones's motion dismiss the firearm specifications in case number CR2022 0271 and his motion to dismiss the case for violating his speedy-trial rights. On December 27, 2022, the trial court denied Jones's motion to dismiss the firearm specifications in case number CR2022 0271 and his motion to dismiss that case for violating his speedy-trial rights.

{¶7} In December 2022, Jones filed motions in case numbers CR2021 0224 and CR2022 0271 requesting that the trial court sever Count Two from case number "CR2021 0224 for trial but then join Count [Two] into the Indictment in [case number] CR2022 0271 for a second trial for the joined counts." (Case No. CR2021 0224, Doc. No. 67); (Case No. CR2022 0271, Doc. No. 29). Jones further requested that Count One in case number CR2021 0353 "should either be severed from these or, if joined, joined for trial with the Domestic Violence charge in [case number] CR2021 0224." (*Id.*); (*Id.*). The State did not oppose Jones's motions and the trial court granted Jones's motions to sever Count Two from case number CR2021 0224 and join it for purposes of trial with case number CR2022 0271.

{¶8} Consequently, Count Two in case number CR2021 0224 along with case number CR2022 0271 proceeded to a jury trial on January 30, 2023. On January 31, 2023, the jury found Jones guilty of Count Two in case number CR2021

0224, Counts One through Four in case number CR2022 0271, and the firearm specification as to Counts One and Four in case number CR2022 0271.

{¶9} On February 8, 2022, Jones withdrew his plea of not guilty in case number CR2021 0353 and entered a guilty plea to the domestic-violence charge alleged in the indictment. In exchange for his change of plea, the State agreed to dismiss the domestic-violence charge in case number CR2021 0224. The trial court accepted Jones's guilty plea, found him guilty, dismissed Count Two in case number CR2021 0224, and ordered a presentence investigation.

{¶10} On March 29, 2023, the trial court sentenced Jones to 12 months in prison on Count Two in case number CR2021 0224 and to 12 months in prison on the count in case number CR2021 0353. (Case No. CR2021 0224, Doc. No. 90); (Case No. CR2021 0353, Doc. No. 47). In case number CR2022 0271, the trial court sentenced Jones to 24 months in prison on Count One, 6 months in prison on Count Two, 12 months in prison on Count Three, 24 months in prison on Count Four, and one year in prison on the firearm specification as to Count Four.[1] (Case No. CR2022 0271, Doc. No. 46). In case number CR2022 0271, the trial court ordered that Jones serve the prison terms imposed as to Count Four and the corresponding firearm specification consecutively. Further, the trial court ordered Jones to serve the prison terms imposed as to Counts One, Two, and Three

---

[1] The trial court filed its judgment entries of sentence on March 30, 2023.

concurrently to the consecutive prison terms imposed as to Count Four and the corresponding firearm specification for an aggregate sentence of 36 months in prison in case number CR2022 0271. The trial court ordered Jones to serve the prison terms imposed in case numbers CR2021 0224 and CR2021 0353 consecutively to the aggregate prison term imposed in case number CR2022 0271 for a total aggregate sentence of two years and 36 months in prison.

{¶11} Jones filed his notices of appeal on April 19, 2023 in all three cases and we consolidated the cases for purposes of appeal. Because Jones did not assign any error as to case number CR2021 0353, assigned appellate case number 1-23-19, we dismiss that case. *See* App.R. 12 and 16.

{¶12} Jones raises four assignments of error as to case numbers CR2021 0224 and CR2022 0271, assigned appellate case numbers 1-23-18 and 1-23-17, respectively.

### First Assignment of Error

**The trial court applied the wrong legal analysis to Mr. Jones' motion to dismiss one-year gun specifications in case number CR 2022-0271 as violative of the Second Amendment of the United States Constitution and of Article I, Section 4 of the Ohio Constitution.** *New York State Rifle & Pistol Ass'n v. Bruen*, **142 S.Ct. 2111, 213 L.Ed.2d 387 (2021). Judgment Entry on Motions, filed December 27, 2022 in CR 2022-0271; October 21, 2022 Transcript at 11-14.**

{¶13} In his first assignment of error, Jones argues that the trial court erred by denying his motion to dismiss the firearm specifications in case number CR2022

0271. Specifically, Jones contends that Ohio's firearm specification under R.C. 2941.141 is unconstitutional (facially and as applied to him) under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen.* 597 U.S. 1, 142 S.Ct. 2111 (2021).

*Standard of Review*

**{¶14}** "Generally, we review a trial court's decision on a motion to dismiss an indictment for [an] abuse of discretion." *State v. Hudson*, 169 Ohio St.3d 216, 2022-Ohio-1435, ¶ 19. An abuse of discretion suggests that a decision is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157-158 (1980).

**{¶15}** However, "appellate courts conduct a de novo review of a trial court's decision concerning a defendant's motion to dismiss all or part of an indictment based upon a constitutional challenge to the statute under which the defendant stands indicted." *State v. Wheatley*, 4th Dist. Hocking No. 17CA3, 2018-Ohio-464, ¶ 5. *See also State v. Bronkar*, 5th Dist. Muskingum No. CT2018-0041, 2019-Ohio-1306, ¶ 12. "De novo review is independent, without deference to the lower court's decision." *State v. Hudson*, 3d Dist. Marion No. 9-12-38, 2013-Ohio-647, ¶ 27.

*Analysis*

**{¶16}** In this case, Jones challenges the constitutionality of Ohio's firearm specification as codified under R.C. 2941.141(A), which assesses "an additional penalty of one year incarceration [in situations where an offender] 'had a firearm on or about the offender's person or under the offender's control while committing the

offense.'" *State v. Windland*, 5th Dist. Licking No. 2023 CA 00068, 2024-Ohio-1827, ¶ 27, quoting R.C. 2941.141(A). Jones contends that Ohio's firearm specification under R.C. 2941.141(A) violates the Second Amendment to the United States Constitutions and Article I, Section 4 of the Ohio Constitution following the United States Supreme Court's decision in *Bruen*.

{¶17} In *Bruen*, the United States Supreme Court announced that "when a statute infringes on a person's Second Amendment right to bear arms, the burden is on the State to demonstrate the 'regulation is consistent with this Nation's historical tradition of firearm regulation.'" *Id.* at ¶ 13, quoting *Bruen* at 17. Prior to the court's decision in *Bruen*, "a defendant challenging the constitutionality of a firearms statute bore the burden of proof, and courts used balancing tests in determining the constitutionality of such statutes." *State v. Parker*, 5th Dist. Licking No. 23CA00009, 2023-Ohio-2127, ¶ 27. The court's decision in "*Bruen* shifts the burden of proof and alters [a trial] court's standard of review for determining the constitutionality of statutes regulating firearms." *Id.* "Courts, however, are not 'obliged to sift the historical materials for evidence to sustain' state statutes limiting the right to carry firearms. That burden falls on the parties presenting the argument." *Id.* at ¶ 28, quoting *State v. Jackson*, 8th Dist. Cuyahoga No. 112020, 2023-Ohio-2063, ¶ 8.

{¶18} We conclude that the trial court did not abuse its discretion by denying Jones's motion to dismiss the firearm specifications in case number CR2022 0271.

That is, under our de novo review, we conclude that Ohio's firearm specification under R.C. 2941.141(A) is constitutional under the United States and Ohio constitutional provisions protecting the right to bear arms. *Accord Windland* at ¶ 29. Specifically, the record reveals that the State satisfied its burden under *Bruen* of demonstrating that R.C. 2941.141(A) is consistent with this Nation's historical tradition of firearm regulation. Specifically, citing *State v. Isreal*, the State proffered that "the right to bear arms is not absolute and prohibiting someone who is committing a felony offense from having a firearm on or about his person or under is [sic] control is a reasonable regulation to the State's police power * * * ." (Doc. No. 22, citing 12th Dist. Warren No. CA2011-11-115, 2012-Ohio-4876, ¶ 97).

**{¶19}** "'An enactment of the General Assembly is presumed to be constitutional, and before a court may declare it unconstitutional it must appear beyond a reasonable doubt that the legislation and constitutional provisions are clearly incompatible.'" *State v. Brown*, 3d Dist. Marion No. 9-10-12, 2010-Ohio-4546, ¶ 9, quoting *State ex rel. Dickman v. Defenbacher*, 164 Ohio St. 142 (1955), paragraph one of the syllabus. "'That presumption of validity of such legislative enactment cannot be overcome unless it appear[s] that there is a clear conflict between the legislation in question and some particular provision or provisions of the Constitution.'" *Id.*, quoting *Xenia v. Schmidt*, 101 Ohio St. 437 (1920), paragraph two of the syllabus.

**{¶20}** "A statute may be challenged on constitutional grounds in two ways: (1) that the statute is unconstitutional on its face, or (2) that it is unconstitutional as applied to the facts of the case." *Id.* at ¶ 10. "To mount a successful facial challenge, the party challenging the statute must demonstrate that there is no set of facts or circumstances under which the statute can be upheld." *Id.*. "Where it is claimed that a statute is unconstitutional as applied, the challenger must present clear and convincing evidence of a presently existing set of facts that make the statute unconstitutional and void when applied to those facts." *Id.*.

**{¶21}** "The Second Amendment to the United States Constitution provides: 'A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.'" *State v. Johnson*, 8th Dist. Cuyahoga No. 113034, 2024-Ohio-1163, ¶ 16, quoting the Second Amendment to the U.S. Constitution. "Article I, Section 4 of the Ohio Constitution sets forth a similar guarantee: 'The people have the right to bear arms for their defense and security; but standing armies, in time of peace, are dangerous to liberty, and shall not be kept up; and the military shall be in strict subordination to the civil power.'" *Windland*, 2024-Ohio-1827, at ¶ 28, quoting Article I, Section IV of the Ohio Constitution.

**{¶22}** Even assuming without deciding that "the possession of a firearm while committing a crime is implicated by the Second Amendment to the United States Constitution and Article I, Section 4 of the Ohio Constitution," our sister

courts of appeal have resolved that R.C. 2941.141(A) is not facially unconstitutional. *Id.* at ¶ 29. Indeed, courts have observed that the United States Supreme Court's decision in "'*Bruen* is rife with historical observations that would exclude from Second Amendment protections individuals that carry firearms to facilitate crime.'" *Id.*, quoting *United States v. Love*, 647 F.Supp.3d 664, 670 (N.D.Ind. 2022). Critically, "'"the people" whose right to bear arms is protected by the Second Amendment are the "law-abiding," responsible citizens, not those who would violate the nation's laws.'" *Id.*, quoting *Love* at 670, quoting *Bruen* at 32. Consequently, we conclude that R.C. 2941.141(A) is not unconstitutional under the United States Constitution or the Ohio Constitution. *See id.* (concluding that this Nation's historical limitations on gun ownership "permits the statutory sentence enhancement for possession of a firearm while committing a crime"). *See also State v. Jenkins*, 5th Dist. Licking No. 2023 CA 00058, 2024-Ohio-1094, ¶ 28 (resolving the constitutionality of an Ohio statute against the framework of the United States Supreme Court's prescription in *Bruen* and concluding that, "[b]ecause the United States Constitution now equally protects the right of the individual to bear arms, we see no obvious distinction between the Ohio Constitution and the United States Constitution").

{¶23} Furthermore, Jones's argument that Ohio's firearm specification under R.C. 2941.141(A) is unconstitutional as applied to him is without merit. Specifically, Jones contends that R.C. 2941.141(A) is unconstitutional as applied to

him because the firearm-specification charges "related to a handgun discovered in his home and not used during the commission of any crime." (Appellant's Brief at 7). Contrary to Jones's contention, the record reveals that the firearm was discovered within close proximity to the location where a large amount of marijuana and methamphetamine was found. *Compare State v. Lane*, 3d Dist. Allen No. 1-21-33, 2022-Ohio-3775, ¶ 28 (concluding that the State presented sufficient evidence supporting Lane's firearm-specification conviction based on the evidence presented at trial that "the firearm was located in close proximately [sic] to the location where the large quantity of cocaine was found"). In other words, Jones was not merely using the firearm for self-defense. Rather, the record reflects that Jones was using the firearm to facilitate drug offenses.

{¶24} Consequently, since the Second Amendment to the United States Constitution and Article I, Section 4 of the Ohio Constitution apply "'only to those who are [not] actively violating the nation's drug laws,'" Ohio's firearm specification under R.C. 2941.141(A) is not unconstitutional as applied to Jones. *Windland* at ¶ 29, quoting *Love* at 670. *See also Jenkins* at ¶ 26 (noting that "Ohio has long recognized the connection between gun violence and drug trafficking").

{¶25} For these reasons, we conclude that the trial court did not abuse its discretion by denying Jones's motion to dismiss the firearm specifications under R.C. 2941.141(A) in case number CR2022 0271.

{¶26} Jones's first assignment of error is overruled.

**Second Assignment of Error**

**Mr. Jones' right to a speedy trial was violated when the state inexcusably delayed at least 423 days in bringing its complete charges against Mr. Jones for the events of May 31, 2021. R.C. 2945.71; Article I, Section 10 of the Ohio Constitution. *State v. Butcher*, 27 Ohio ST.3d 28, 500 N.E.2d 1368 (1986); *Barker v. Wingo*, 407 U.S. 514, 530, 95 S.Ct. 2181, 33 L.Ed.23 101 (1972). Judgment Entry on Motions at 1, filed December 27, 2022 in CR 2022-0271.**

{¶27} In his second assignment of error, Jones argues that the trial court erred by denying his motion to dismiss the indictment in case number CR2022 0271 alleging that his constitutional and statutory speedy-trial rights were violated. Jones specifically contends that the indictment in case number CR2022 0271 "should be controlled by the same speedy-trial clock [applicable to case number CR2021 0224] because the factual grounds for both indictments were discovered on the same day." (Appellant's Brief at 13).

*Standard of Review*

{¶28} "Appellate review of a trial court's decision on a motion to dismiss for a speedy-trial violation involves a mixed question of law and fact." *State v. Westerfield*, 3d Dist. Crawford No. 3-17-15, 2018-Ohio-2139, ¶ 17. "'Accordingly, a reviewing court must give due deference to the trial court's findings of fact if they are supported by competent, credible evidence but will independently review whether the trial court correctly applied the law to the facts of the case.'" *State v. Gartrell*, 3d Dist. Marion No. 9-14-02, 2014-Ohio-5203, ¶ 104, quoting *State v.*

*Hansen*, 3d Dist. Seneca No. 13-12-42, 2013-Ohio-1735, ¶ 20. Consequently, "[t]he proper standard of review in speedy trial cases is to simply count the number of days passed, while determining to which party the time is chargeable, as directed in R.C. 2945.71 and 2945.72." *State v. Ferguson*, 10th Dist. Franklin No. 16AP-307, 2016-Ohio-8537, ¶ 12.

*Analysis*

{¶29} "An accused is guaranteed the constitutional right to a speedy trial pursuant to the Sixth and Fourteenth Amendments of the United States Constitution and Ohio Constitution, Article I, Section 10." *Id.* "Ohio's speedy trial statutes, found in R.C. 2945.71 et seq., were implemented to enforce those constitutional guarantees." *Id.* "R.C. 2945.71 provides the timeframe for a defendant's right to a speedy trial based on the level of offense." *State v. Matland*, 7th Dist. Mahoning No. 09-MA-115, 2010-Ohio-6585, ¶ 19. "[A] person against whom a charge of felony is pending shall be brought to trial within two hundred seventy days after his arrest." R.C. 2945.71(C)(2). "The date of the arrest is not included for the purpose of calculating time under the statutes for a speedy trial." *State v. Taylor*, 3d Dist. Allen No. 1-13-46, 2014-Ohio-1793, ¶ 27. "However, each day the defendant spends in jail solely on the pending criminal charge counts as three days." *Matland* at ¶ 19, citing R.C. 2945.71(E). "R.C. 2945.72 allows for an extension of the time that the accused must be brought to trial under certain circumstances." *Taylor* at ¶ 28.

**{¶30}** ""'"[W]hen new and additional charges arise from the same facts as did the original charge and the state knew of such facts at the time of the initial indictment, the time within which trial is to begin on the additional charge is subject to the same statutory limitations period [for speedy-trial time] that is applied to the original charge."'"" *State v. Parker*, 113 Ohio St.3d 207, 2007-Ohio-1534, ¶ 18, quoting *State v. Adams*, 43 Ohio St.3d 67, 68 (1989), quoting *State v. Clay*, 9 Ohio App.3d 216, 218 (11th Dist.1983). However, "'[w]hen additional criminal charges arise from facts distinct from those supporting an original charge, or the state was unaware of such facts at that time, the state is not required to bring the accused to trial within the same statutory period as the original charge under R.C. 2945.71 et seq." *Id.* at ¶ 19, quoting *State v. Baker*, 78 Ohio St.3d 108, 112 (1997). "Instead, the defendant's speedy trial time begins to run from the time that the subsequent charge was filed * * * or after the defendant's arrest, if the state was unable to serve the defendant with the summons." *State v. Havens*, 4th Dist. Ross No. 21CA3745, 2022-Ohio-1712, ¶ 14. *See also State v. Sanford*, 170 Ohio St.3d 204, 2022-Ohio-3107, ¶ 25 (recognizing "that when new facts come to light after an arrest, additional offenses charged may be subject to a new speedy-trial period").

**{¶31}** Importantly, our sister courts of appeal have reasoned "that a subsequent indictment for a drug offense, which was dependent upon a lab analysis to identify the drug and was not available to the state at the time of the original indictment, is an additional fact that starts the running of a new speedy trial clock

-15-

for the subsequent charge." *Havens* at ¶ 15. *See also State v. Mohamed*, 10th Dist. Franklin No. 08AP-960, 2009-Ohio-6658, ¶ 42 (noting that "several appellate districts have analyzed similar facts and repeatedly found that laboratory results that were not known at the time of the original indictment constituted 'additional facts,' which warranted the triggering of a new speedy trial clock" and that "[t]he Second, Fourth, Ninth, Eleventh, and Twelfth District Courts of Appeals have all held that a subsequent indictment which was dependent upon a lab analysis that was not available to the state at the time of the original indictment starts the running of a new speedy trial clock"). *But see State v. Cooney*, 124 Ohio App.3d 570, 573 (1st Dist.1997); *State v. Rutkowski*, 8th Dist. Cuyahoga No. 86289, 2006-Ohio-1087, ¶ 26.

**{¶32}** "If a defendant 'establishes a prima facie case of a violation of his right to a speedy trial, the burden then shifts to the State' to demonstrate either that the statutory limit was not exceeded, or that the State's time to bring the defendant to trial was properly extended." *State v. Wagner*, 2d Dist. Miami No. 2020-CA-6, 2021-Ohio-1671, ¶ 12, quoting *State v. Nichols*, 5th Dist. Richland No. 04CA56, 2005-Ohio-1771, ¶ 11. "If the State fails to meet the statutory time limits, then the trial court must discharge the defendant." *Matland*, 2010-Ohio-6585, at ¶ 19, citing R.C. 2945.73. The Supreme Court of Ohio has 'imposed upon the prosecution and the trial courts the mandatory duty of complying' with the speedy-trial statutes."

*Id.*, quoting *State v. Singer*, 50 Ohio St.2d 103, 105 (1977). Consequently, "the speedy-trial provisions are strictly construed against the State." *Id.*

**{¶33}** In this case, Jones contends that his speedy-trial clock (for case number CR2022 0271) began running when he was indicted in case number CR2021 0224. Consequently, Jones maintains that the trial court erred by denying his motion to dismiss the indictment in case number CR2022 0271 since he was not brought to trial within 270 days. The State disputes that Jones's speedy-trial rights were violated because case number CR2022 0271 was resolved before Jones's 270-day speedy trial time expired. That is, the State contends that Jones's speedy-trial clock commenced when it filed the indictment in case number CR2022 0271 since it was based on "additional facts," which warranted a new speedy-trial clock.

**{¶34}** Based on our review of the facts and circumstances presented, we conclude that the State was not subject to the speedy trial time limits of Jones's original indictment since the subsequent charges in case number CR2022 0271 were based on additional facts which were revealed through further investigation. *Accord State v. Armstrong*, 9th Dist. Medina No. 03CA0064-M, 2004-Ohio-726, ¶ 9. Critically, the record reveals that, at the time the charges were filed in case number CR2021 0224, the State did not have all the information necessary to bring the additional charges in case number CR2022 0271. *See Sanford*, 170 Ohio St.3d 204, 2022-Ohio-3107, at ¶ 29. Indeed, the specific facts and circumstances presented reveal that the charges in case number CR2022 0271 were dependent on Ohio's

Bureau of Criminal Investigation's ("BCI") laboratory analysis. *Accord Armstrong* at ¶ 10.

**{¶35}** In particular, the record reveals that the identity and quantity of the substances recovered at Jones's residence were unknown to law enforcement until BCI laboratory testing disclosed that "the pressed pills that were recovered" "included [5.29 grams of] Methamphetamine" as opposed to ecstasy as claimed by Jones. (Appellee's Brief at 13). Importantly, BCI's laboratory analysis was imperative for the State "to bring the proper charges" because ecstasy and methamphetamine not only fall on different schedules of controlled substances but the prohibited bulk amount for each substances is drastically different. (*Id.*). *Compare Mohamed*, 2009-Ohio-6658, at ¶ 52 (analyzing that the "[d]etermination of the drug's exact organic make-up is critical to determining the level of the felony offense with which [a defendant] should be charged, given that possession of this drug falls into two different schedules"). Specifically, the State explained that, "[i]f [it] proceeded to charge the drugs improperly as Ecstasy, then the 5.29 grams would fall well below the bulk amount of 30 grams," resulting in a "felony of the fifth degree." (Appellee's Brief at 13).

**{¶36}** Based on the foregoing, we conclude that the State did not have all of the information necessary to support Jones's aggravated-possession-of-drugs charges (as alleged in case number CR2022 0271). *See Sanford* at ¶ 31-32. That is, the information specific to the identity and weight of the methamphetamine was

not available to the State at the time it brought the charges in case number CR2021 0224. Decisively, such information was necessary to charge Jones in case number CR2022 0271. Consequently, we conclude that a new speedy-trial period began to run from the date of Jones's indictment in case number CR2022 0271. *See Armstrong* at ¶ 10; *Mohamed* at ¶ 52.

{¶37} Nevertheless, Jones argues that the subsequent indictment in case number CR2022 0271 runs afoul of his statutory speedy trial rights because 14 months elapsed between the indictments in case numbers CR2021 0224 and CR2022 0271. Specifically, Jones alleges that "the state did not explain whether BCI was responsible for the delay, when precisely the prosecution received the lab results, or why 'simple laboratory analysis' would have necessitated such a long delay." (Appellant's Brief at 14). However, based on our determination that a *new* speedy-trial period began to run from the date of Jones's indictment in case number CR2022 0271, we conclude that Jones's argument is without merit. For these reasons, since Jones does not dispute that he was brought to trial within 270 days of his indictment in case number CR2022 0271, Jones's statutory speedy trial rights were not violated.

{¶38} Even so, Jones contends that his *constitutional* speedy trial rights were violated. "Although 'statutory and constitutional speedy trial [rights] are [generally] coextensive,' the constitutional right, as embodied in the Ohio Constitution and the United States Constitution, 'may be broader than the * * * statutory right' in some

circumstances." *Wagner*, 2021-Ohio-1671, at ¶ 14, quoting *State v. Kadunc*, 10th Dist. Franklin No. 15AP-920, 2016-Ohio-4637, ¶ 19. "'To determine whether a defendant has been deprived of [their] constitutional speedy-trial rights, a court must balance four factors: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of a speedy-trial right, and (4) the prejudice to the defendant.'" *State v. Irish*, 3d Dist. Mercer No. 10-18-13, 2019-Ohio-2765, ¶ 25, quoting *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, ¶ 88.

**{¶39}** "However, prior to engaging in any balancing, 'the court must make a threshold determination concerning the length of [the] delay.'" *Id.* at ¶ 26, quoting *Adams* at ¶ 89. "'"Until there is some delay *which is presumptively prejudicial*, there is no necessity for inquiry into the other factors that go into the balance."'" (Emphasis sic.) *Id.*, quoting *State v. Hull*, 110 Ohio St.3d 183, 2006-Ohio-4252, ¶ 23, quoting *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182 (1972). "A delay becomes presumptively prejudicial as it approaches one year in length." *Adams* at ¶ 90, citing *Doggett v. United States*, 505 U.S. 647, 652, 112 S.Ct. 2686 (1992), fn. 1.

**{¶40}** In support of his argument that his constitutional speedy trial rights were violated, Jones merely states (without any further analysis) that "[a]ll four of the *Barker* constitutional speedy trial factors weigh in favor of Mr. Jones, and so the indictment in CR 2022-0271 should have been dismissed on both statutory and constitutional grounds." (Appellant's Brief at 17).

**{¶41}** "[A] defendant has the burden of affirmatively demonstrating the error of the trial court on appeal." *State v. Stelzer*, 9th Dist. Summit No. 23174, 2006-Ohio-6912, ¶ 7. "Moreover, '[i]f an argument exists that can support this assignment of error, it is not this court's duty to root it out.'" *Id.*, quoting *State v. Cook*, 9th Dist. Summit No. 20675, 2002-Ohio-2646, ¶ 27. "App.R. 12(A)(2) provides that an appellate court 'may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App.R. 16(A).'" *State v. Jackson*, 10th Dist. Franklin No. 14AP-670, 2015-Ohio-3322, ¶ 11, quoting App.R. 12(A)(2). "Additionally, App.R. 16(A)(7) requires that an appellant's brief include '[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies.'" *Id.*, quoting App.R. 16(A)(7).

**{¶42}** Notwithstanding Jones's failure to include an agreement regarding how his constitutional speedy trial rights were violated, we nevertheless conclude that his constitutional speedy trial rights were not violated. Importantly, since Jones's speedy trial clock began running from the date of Jones's indictment in case number CR2022 0271, he cannot demonstrate that any delay was presumptively prejudicial. See Mohamed, 2009-Ohio-6658, at ¶ 53-65. That is, Jones was indicted

in case number CR2022 0271 on September 15, 2022 and brought to trial on January 30, 2023.

{¶43} Thus, Jones's second assignment of error is overruled.

## Third Assignment of Error

**The trial court violated Mr. Jones' statutory right to receive a single punishment for the same offense, and his constitutional double jeopardy rights to be free from multiple punishments, when it refused to merge Count 3, Aggravated Possession of Drugs (Crystal Methamphetamine), with Count 4, Aggravated Possession of Drugs (Pill Methamphetamine) in CR 2022-0271. State v. Ruff. 143 Ohio St.3d 144, 2015-Ohio-995, 34 N.E.3d 892; Missouri v. Hunter, 459 U.S. 359, 366, 103 S.Ct. 673, 74 L.Ed2d 535 (1983). Sentencing Tr. 11:6-20.**

{¶44} In his third assignment of error, Jones argues that the trial court erred by failing to merge his aggravated-possession-of-drugs convictions as alleged in Counts Three and Four of case number CR2022 0271. Specifically, Jones contends that his aggravated-possession-of-drugs convictions are allied offenses of similar import because "[t]his record contains no evidence that [he] possessed crystal-form methamphetamine for some purpose distinct from his possession of pill-form methamphetamine." (Appellant's Brief at 22).

*Standard of Review*

{¶45} Whether offenses are allied offenses of similar import is a question of law that this court reviews de novo. *State v. Stall*, 3d Dist. Crawford No. 3-10-12, 2011-Ohio-5733, ¶ 15. Again, "[d]e novo review is independent, without deference to the lower court's decision." *Hudson*, 2013-Ohio-647, at ¶ 27.

*Analysis*

**{¶46}** "The Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution prohibit a criminal defendant from being tried twice for the same offense." *State v. Pendleton*, 163 Ohio St.3d 114, 2020-Ohio-6833, ¶ 8. "This prohibition applies to successive prosecutions as well as to multiple punishments for the same offense." *Id.* "Regarding multiple punishments for the same offense, the Double Jeopardy Clause prohibits 'the sentencing court from prescribing greater punishment than the legislature intended.'" *Id.*, quoting *Missouri v. Hunter*, 459 U.S. 359, 366, 103 S.Ct. 673 (1983). Thus, "[w]hen determining whether multiple punishments may be imposed for the same offense, our focus is on legislative intent." *Id.* *See also Benvenuto v. Turner*, N.D.Ohio No. 3:19-CV-02353, 2023 WL 2711293, *3 (Mar. 30, 2023) ("Ultimately, the double-jeopardy inquiry asks whether the legislature has authorized cumulative punishments for the same conduct.").

In Ohio,

> R.C. 2941.25 was enacted so that if "'the same conduct by the defendant technically amounts to two or more related offenses, he should be guilty of only one offense,' and conversely, that if 'his conduct amounts to two or more different offenses, or to two or more offenses of the same kind committed at different times or with a separate evil purpose as to each, then it should be possible to convict him of all such crimes.'"

*Pendleton* at ¶ 9, quoting *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, ¶

16, quoting Ohio Legislative Serv. Comm., Proposed Ohio Criminal Code 308

(Mar.1971). Specifically, R.C. 2941.25, Ohio's multiple-count statute, states:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
>
> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

**{¶47}** The Supreme Court of Ohio directs us to apply a three-part test to

determine whether a defendant can be convicted of multiple offenses:

> "As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered."

*State v. Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615, ¶ 12, quoting *State v. Ruff*,

143 Ohio St.3d 114, 2015-Ohio-995, ¶ 31. *See also State v. Gilmer*, 6th Dist. Lucas

No. L-22-1307, 2024-Ohio-1178, ¶ 87 ("If the answer to any of these questions is

'yes,' the defendant may be convicted and sentenced for multiple offenses."). "The

burden is on the defendant to establish his entitlement to the protection provided by

R.C. 2941.25 against multiple punishments for a single criminal act." *State v. Artis*, 3d Dist. Logan No. 8-18-40, 2019-Ohio-2070, ¶ 44.

**{¶48}** "As explained in *Ruff*, offenses are of dissimilar import 'when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable.'" *State v. Bailey*, 1st Dist. Hamilton No. C-140129, 2015-Ohio-2997, ¶ 77, quoting *Ruff* at paragraph two of the syllabus. "At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct. The evidence at trial * * * will reveal whether the offenses have similar import." *Ruff* at ¶ 26. "[A] defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense." *Id. See also State v. Daboni*, 4th Dist. Meigs No. 18CA3, 2018-Ohio-4155, ¶ 53 (determining that "[t]he offenses of possession and trafficking in drugs" are generally "similar in significance and import where * * * the victims of the offense were the same and the harm was not separate and identifiable").

**{¶49}** "The term 'animus' means '"purpose or, more properly, immediate motive."'" *State v. Ramey*, 2d Dist. Clark No. 2014-CA-127, 2015-Ohio-5389, ¶ 70, quoting *State v. Grissom*, 2d Dist. Montgomery No. 25750, 2014-Ohio-857, ¶ 40, quoting *State v. Logan*, 60 Ohio St.2d 126, 131 (1979). "'Where an individual's immediate motive involves the commission of one offense, but in the course of

committing that crime he must * * * commit another, then he may well possess but a single animus, and in that event may be convicted of only one crime.'" *Id.*, quoting *Logan* at 131. "'Like all mental states, animus is often difficult to prove directly, but must be inferred from the surrounding circumstances.'" *Id.* at ¶ 71, quoting *Logan* at 131. "'Thus the manner in which a defendant engages in a course of conduct may indicate distinct purposes.'" *Id.*, quoting *State v. Whipple*, 1st Dist. Hamilton No. C-110184, 2012-Ohio-2938, ¶ 38. "'Courts should consider what facts appear in the record that "distinguish the circumstances or draw a line of distinction that enables a trier of fact to reasonably conclude separate and distinct crimes were committed."'" *Id.*, quoting *Whipple* at ¶ 38, quoting *State v. Glenn*, 8th Dist. Cuyahoga No. 94425, 2012-Ohio-1530, ¶ 9.

{¶50} On appeal, Jones argues that the trial court erred by failing to merge his aggravated-possession-of-drugs convictions under Counts 3 and 4 in case number CR2022 0271 because "[t]he relevant drug-related statutes do not clearly indicate that the General Assembly intended to punish crystal-form and pill-form methamphetamine doubly." (Appellant's Brief at 19). In other words, Jones contends that we need not engage in the three-part analysis because R.C. 2925.11 reflects a legislative intent to calibrate the punishment for the possession offense based on the aggregate-drug weight. *Compare State v. Saxton*, 10th Dist. Franklin No. 18AP-925, 2019-Ohio-5257, ¶ 41 (arguing that the appellate court "need not engage in the *Ruff* analysis because R.C. 2925.11, the possession statute, indicates

-26-

a legislative intent to calibrate the punishment for the offense based on the aggregate drug weight").

**{¶51}** Typically, "'where two statutory provisions proscribe the "same offense," they are construed not to authorize cumulative punishments *in the absence of a clear indication of contrary legislative intent*.'" (Emphasis sic.) *Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, at ¶ 11, quoting *Whalen v. United States*, 445 U.S. 684, 692, 100 S.Ct. 1432 (1980). "However, where the statute creating the offense does not illuminate the General Assembly's intent on whether multiple punishments should be imposed, we look to R.C. 2941.25 for guidance." *State v. Merz*, 1st Dist. Hamilton No. C-200152, 2021-Ohio-2093, ¶ 6. Specifically, in situations in which the facts and circumstances of the case reveal that there are "two separate occurrences, or if there are separate victims, such as two or more victims in one occurrence, which are then considered multiple offenses, then courts must determine whether the multiple offenses are allied ones of similar import under R.C. 2941.25." *State v. Smith*, 8th Dist. Cuyahoga No. 104553, 2017-Ohio-537, ¶ 21, citing *Ruff* at ¶ 24. That is, in such "situation, the legislative intent behind the alternative methods of committing a single offense no longer controls the outcome." *Id.* Nevertheless, "[t]he General Assembly's test in R.C. 2941.25 for determining whether two offenses are allied offenses of similar import can help a court construe whether the legislature intended to allow multiple punishments for the same conduct." *Pendleton*, 163 Ohio St.3d 114, 2020-Ohio-6833, at ¶ 11.

**{¶52}** Here, Jones was convicted of aggravated possession of drugs in violation of R.C. 2925.11(A), (C)(1)(b). That statute provides, in its relevant part, that "[n]o person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog." R.C. 2925.11(A). The statute elevates the level of the offense "[i]f the drug involved in the violation is a compound, mixture, preparation, or substance included in schedule I or II, with the exception of marihuana, cocaine, L.S.D., heroin, any fentanyl-related compound, hashish, and any controlled substance analog" and "[i]f the amount of the drug involved equals or exceeds the bulk amount but is less than five times the bulk amount * * * ." R.C. 2925.11(C)(1)(b). The statute defines a "bulk amount" of a controlled substance, in relevant part, as,

> "[f]or any compound, mixture, preparation, or substance included in
> * * * schedule II, * * * [a]n amount equal to or exceeding three grams
> of a compound, mixture, preparation, or substance that is or contains
> any amount of a schedule II stimulant, or any of its salts or isomers,
> that is not in a final dosage form manufactured by a person authorized
> by the Federal Food, Drug, and Cosmetic Act and the federal drug
> abuse control laws.

R.C. 2925.01(D)(1)(g).

**{¶53}** Under Counts 3 and 4 in case number CR2022 0271, the State alleged that Jones possessed methamphetamine, which "is a controlled substance listed in Schedule II." *State v. Rollins*, 3d Dist. Paulding No. 11-05-08, 2006-Ohio-1879, ¶ 30. The Revised Code defines "methamphetamine" as including "methamphetamine, any salt, isomer, or salt of an isomer of methamphetamine, or

any compound, mixture, preparation, or substance containing methamphetamine or any salt, isomer, or salt of an isomer of methamphetamine." R.C. 2925.01(II).

{¶54} Ohio's statutes prohibiting drug possession and drug trafficking, R.C. 2925.03 and 2925.11, provide a unique context for the application of the Double Jeopardy Clause * * * ." *Pendleton*, 163 Ohio St.3d 114, 2020-Ohio-6833, at ¶ 18. Specifically, those "statutes create different felony levels and impose different punishments 'depending on the type and amount of illegal substance upon which a criminal charge could be made,' * * * and because the statutes involve a presumption about the nature of the substance in order to satisfy the 'amount' element.'" *Id.*, quoting *State v. Taylor*, 113 Ohio St.3d 297, 2007-Ohio-1950, ¶ 14.

{¶55} Generally, it is well established that "'the legislature intended the possession of the different drug groups to constitute different offenses.'" *State v. Polachek*, 5th Dist. Richland No. 2010-CA-41, 2010-Ohio-5421, ¶ 27, quoting *State v. Delfino*, 22 Ohio St.3d 270, 273 (1986). *See also State v. Seawright*, 8th Dist. Cuyahoga No. 109489, 2021-Ohio-1100, ¶ 14 (affirming "that different substances, packaged separately, are not allied offenses of similar import"). In other words, "the simultaneous possession of *two types* of drugs constitutes two separate offenses that do not merge as allied offenses of similar import under R.C. 2925.11." (Emphasis added.) *State v. Perry*, 8th Dist. Cuyahoga No. 105501, 2018-Ohio-487, ¶ 32. *See also State v. Quigley*, 8th Dist. Cuyahoga No. 105752, 2018-Ohio-1520, ¶ 17 ("The argument that simultaneous possession of more than one drug of the

same drug schedule constitutes allied offenses of similar import has been rejected many times.").

**{¶56}** Here, however, Jones was found guilty of committing two separate counts of possessing the *same* substance (albeit in different forms). Notwithstanding that distinction, the specific facts and circumstances of this case reveal that the plain language of R.C. 2925.11 supports multiple punishments for Jones's possession of the same substance in different forms. *See Pendleton* at ¶ 12. That is, we conclude that the resolution of this appeal requires us to apply R.C. 2941.25 because the General Assembly's intent is not clear on the face of R.C. 2925.11. *See Saxton*, 2019-Ohio-5257, at ¶ 43 (concluding that the three-part analysis applies because "R.C. 2925.11 [does not] evince[e] an intent to preclude additional possession charges once the major drug offender threshold has been reached and the offender possessed the additional drugs at a separate geographic location").

**{¶57}** In support of his argument that his convictions are allied offenses of similar import under R.C. 2941.25, Jones contends that the "record contains no evidence that Mr. Jones possessed crystal-form methamphetamine for some purpose distinct from his possession of pill-form methamphetamine." (Appellant's Brief at 22). The State disputes Jones's argument and argues that "the offenses were committed separately" and "with separate animus or motivation" because "[t]he drugs were in different forms, in different locations, and one was found in a

backpack which would indicate portability" for purposes of sale. (Appellee's Brief at 20). Likewise, the State points to the evidence that Jones "said [in] his interview that he found the pills and had consumed one, which indicated he was using them for personal use." (*Id.*).

{¶58} Based on the specific facts and circumstances of this case, we conclude that the trial court did not err by failing to merge Jones's aggravated-possession-of-drugs convictions under Counts 3 and 4 in case number CR2022 0271. *Accord State v. Gomez*, 10th Dist. Franklin No. 16AP-560, 2017-Ohio-8832, ¶ 15, 25 (concluding that "where the facts presented indicate the recovery of stashes found at separate locations, involving different quantities of drugs," Gomez did not demonstrate that his "simultaneous possession of the same type of drug found at different locations" were " allied offenses of similar import committed with the same conduct and without a separate animus"). That is, even though the methamphetamine was discovered on the same day in Jones's residence (albeit in different forms), we conclude that Jones committed the offenses separately and with a separate animus or motivation.

{¶59} Significantly, this court has concluded that the simultaneous possession of a single drug in different forms is not dispositive of an allied-offense analysis. *See State v. Kamara*, 3d Dist. Union No. 14-18-26, 2019-Ohio-5385, ¶ 47 (concluding that "although powder cocaine and crack cocaine are two different forms of cocaine, that fact is not dispositive"), citing *State v. Brown*, 3d Dist. Allen

No. 1-10-31, 2011-Ohio-1461, ¶ 41 (holding that "the simultaneous possession of crack cocaine and possession of powder cocaine are separate and distinct offenses") and *State v. Cartlidge*, 3d Dist. Seneca No. 13-18-33, 2019-Ohio-1283, ¶ 32 (noting that the fact that two drug packages both contained heroin is "not dispositive" to determining whether Cartlidge's convictions for aggravated trafficking in drugs and aggravated possession of drugs are allied offenses of similar import). Indeed, "[u]nder Ohio law, the fact that drugs may have been recovered on the same date is not dispositive of the allied offense issue." *Gomez* at ¶ 24.

{¶60} Importantly, courts have analyzed that "although it is possible to possess a drug with the same animus and conduct necessary to traffic it, once the drug is initially possessed, a separate animus 'distinct in time, supported by different conduct' can take place resulting in the additional offense being committed separately." *Daboni*, 2018-Ohio-4155, at ¶ 53, quoting *State v. Rodriguez*, 12th Dist. Butler No. CA2015-02-024, 2016-Ohio-452, ¶ 29. "Thus, possession and trafficking offenses may be allied offenses of similar import, or not, depending on the particular facts and motivations of those involved." *Id. See also State v. Kremer*, 12th Dist. Warren No. CA2017-07-115, 2018-Ohio-3339, ¶ 36 (affirming "that possession and trafficking can constitute allied offenses of similar import, except in instances where the offenses are committed separately or where a different animus or motivation is apparent").

**{¶61}** In this case, the record reveals that law enforcement recovered differing quantities of the pill-form methamphetamine and crystal-form methamphetamine in different locations of Jones's residence. *Accord Gomez* at ¶ 25 (analyzing "that law enforcement officials recovered differing quantities of heroin in different locations on the date at issue"). *See also Kamara* at ¶ 45 (analyzing that "the powder cocaine and crack cocaine were packaged separately"; that "[t]he packages also contained two different quantities of cocaine"; "the two packages were found on different locations on McWilliams's body" and "the two packages contained different forms of the substance to be purchased by different users"). Specifically, after searching Jones's residence on May 31, 2021, law enforcement recovered 5.11 grams of methamphetamine in crystal form and 12.8 grams of methamphetamine in pill form. (*See* Jan. 30-31, 2023 Tr., Vol. I, at 237, 282). The crystal-form methamphetamine was discovered in close proximity to digital scales with white residue along with creatine powder, which is "used to * * * cut drugs for sale." (*Id.* at 232). Separately, law enforcement recovered the pill-form methamphetamine from a backpack that also contained a large amount marijuana. The backpack containing the drugs was found hidden in a pile of clothing, which was situated next to the door of Jones's residence. Also hidden in the pile of clothing was a firearm.

**{¶62}** Based on these facts, we conclude that Jones possessed the pill-form methamphetamine and crystal-form methamphetamine separately and with a

separate animus or motivation. *See State v. Delgadillo-Banuelos*, 10th Dist. Franklin No. 18AP-729, 2019-Ohio-4174, ¶ 20 (concluding that "where the facts presented indicate law enforcement's recovery on the same date of differing quantities of the same type of illicit substance at different locations, R.C. 2941.25 permits a conviction and sentence for each of the offenses"). Critically, the record reveals that law enforcement discovered two distinctly different stashes of methamphetamine in this case. *See id.* at ¶ 18, quoting *Gomez* at ¶ 20, fn. 1 (identifying "federal courts [that] 'have held that convictions for multiple counts of possession on the same date involving distinct stashes of drugs do not raise multiplicity or double jeopardy issues'"). Moreover, the record reveals that pill-form methamphetamine and crystal-form methamphetamine were not only in different forms but they were also packaged separately. *Compare Kamara* at ¶ 47 ("The packaging of the bag of crack cocaine separately from the powder cocaine demonstrates the separate animus of preparation for sale to at least two different drug users."); *Cartlidge*, 2019-Ohio-1283, at ¶ 32 (concluding that the possession and trafficking convictions were not allied offenses of similar import because "the drugs were packaged separately").

{¶63} Consequently, we conclude that Jones "possessed the drugs separately, and with a separate animus or motivation." *State v. Wolfe*, 5th Dist. Muskingum No. CT2021-0021, 2022-Ohio-117, ¶ 36. *See also Rodriguez*, 2016-Ohio-452, at ¶ 28 (concluding that there was "nothing in the record * * * to establish

that Rodriguez possessed the marijuana and trafficked a portion of it with only one animus or motivation, or that his offenses did not occur separately"). Thus, the trial court did not err by failing to merge Jones's aggravated-possession-of-drugs convictions.

{¶64} Jones's third assignment of error is overruled.

### Fourth Assignment of Error

**The state racially discriminated against Mr. Jones' [sic] by using its preemptory [sic] challenges to strike all black jurors from his trial jury, violating his right to equal protection of the laws under the Fourteenth Amendment.** *Batson v. Kentucky*, **476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d. 69 (1986). Trial Tr. Vol. I, at 56:4-59:20; 181:7-11; 63:16; 61:6-64:18; 181:11-15; 181:21-8.**

{¶65} In his fourth assignment of error, Jones contends that the State, "[u]sing two of its four peremptory challenges," "struck two of two black jurors who had any reasonable chance of being seated on [his] jury" in violation of *Batson v. Kentucky*. (Appellant's Brief at 23, citing 476 U.S. 79, 106 S.Ct. 1712 (1986)). In particular, Jones contends that the trial court erroneously reasoned that the State's race-neutral reasons for excusing the jurors were pretextual for racial discrimination.

### *Standard of Review*

{¶66} "The decision of a trial court regarding a prosecutor's motives for exercising a peremptory challenge is a factual determination which will not be overturned unless clearly erroneous." *State v. Powers*, 92 Ohio App.3d 400, 405-

-35-

406 (10th Dist.1993). *See also State v. Prieto*, 7th Dist. Mahoning No. 15 MA 0200, 2016-Ohio-8480, ¶ 47 ("We do not reverse a trial court's decision on intentional discrimination unless the court was clearly erroneous in accepting the state's explanation as genuine (as opposed to pretextual).").  But, this court "must defer to the trial court's credibility decision." *Prieto* at ¶ 47.  "'Under the clearly erroneous standard of review, a reviewing court can only reverse if it is "left with the definite and firm conviction that a mistake has been committed."'" *State v. Hawkins*, 3d Dist. Allen No. 1-18-08, 2018-Ohio-4649, ¶ 9, quoting *State v. Williams*, 8th Dist. Cuyahoga No. 100488, 2014-Ohio-3138, ¶ 8, quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504 (1985).  *See also Snyder v. Louisiana*, 552 U.S. 472, 477-479, 128 S.Ct. 1203 (2008) (noting that appellate courts employ a "highly deferential standard of review" when evaluating trial courts' resolutions of *Batson* challenges).

{¶67} "If, however, a trial court does err in applying *Batson*, the error is structural." *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, ¶ 53.  "A structural error is a constitutional defect that defies analysis by harmless error standards, because it affects the framework within which the trial proceeds, rather than simply being an error in the trial process itself." *State v. Fields*, 12th Dist. Butler No. CA2005-03-067, 2005-Ohio-6270, ¶ 27.

> Structural error affects the substantial rights of a criminal defendant, even absent a specific showing that the outcome of the trial would have been different, and requires automatic reversal.  Because a

defendant is relieved of his burden to show prejudice, the finding of structural error is rare and limited to exceptional cases.

*State v. Martin*, 103 Ohio St.3d 385, 2004-Ohio-5471, ¶ 53 (Moyer, J., concurring in judgment only). The "'limited class of cases'" recognizing structural error are cases "in which the errors permeate the 'entire conduct of the trial from beginning to end,' so that the trial court cannot '"reliably serve its function as a vehicle for determination of guilt or innocence."'" *Fields* at ¶ 27, quoting *Arizona v. Fulminante*, 449 U.S. 279, 309-310, 111 S.Ct. 1246 (1991), quoting *Rose v. Clark*, 478 U.S. 570, 577-578, 106 S.Ct. 3101 (1986).

*Analysis*

**{¶68}** "'In *Batson v. Kentucky*, the United States Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race."'" *State v. Pope*, 3d Dist. Marion No. 9-06-61, 2007-Ohio-5485, ¶ 7, quoting *State v. Douglas*, 3d Dist. Marion No. 9-05-24, 2005-Ohio-6304, ¶ 28, quoting *Batson*, 476 U.S. at 89. "The Court stated that a defendant can demonstrate a violation of his equal protection rights pursuant to the Fourteenth Amendment of the United States Constitution by showing that the State's use of peremptory challenges at the defendant's trial was used to intentionally exclude members of the defendant's race." *State v. Evans*, 3d Dist. Allen No. 1-10-22, 2010-Ohio-4813, ¶ 6.

**{¶69}** "'"A court adjudicates a *Batson* claim in three steps."'" *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, ¶ 64, quoting *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, ¶ 106, quoting *State v. Murphy*, 91 Ohio St.3d 516, 528 (2001). "'First, the opponent of the peremptory challenge must make a prima facie case of racial discrimination.'" *Id.*, quoting *Bryan* at ¶ 106. "At the first step of the *Batson* inquiry, the defendant is not required to demonstrate that 'the challenge was more likely than not the product of purposeful discrimination.'" *Hawkins*, 2018-Ohio-4649, at ¶ 9, quoting *Johnson v. California*, 545 U.S. 162, 170-173, 125 S.Ct. 2410 (2005). "'Instead, a defendant satisfies the requirements of *Batson's* first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.'" *Id.*, quoting *Johnson* at 170.

**{¶70}** "'Second, if the trial court finds [a prima facie case of discrimination], the proponent of the challenge must provide a racially neutral explanation for the challenge.'" *Frazier* at ¶ 64, quoting *Bryan* at ¶ 106. "At the second step of the inquiry, '"the issue is the facial validity of the prosecutor's explanation."'" *Hawkins* at ¶ 10, quoting *Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, at ¶ 51, quoting *Hernandez v. New York*, 500 U.S. 352, 360, 111 S.Ct. 1859 (1991). "While 'it is not enough to simply deny a discriminatory motive or assert good faith,' the '"explanation need not rise to the level justifying exercise of a challenge for cause."'" *Id.*, quoting *Thompson* at ¶ 51, quoting *Batson* at 97. "Accordingly, '"[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the

reason offered will be deemed race neutral."'"" *Thompson* at ¶ 51, quoting *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769 (1995), quoting *Hernandez* at 360.

**{¶71}** "Finally, in step three, 'the trial court must decide, based on all the circumstances, whether the opponent has proved purposeful racial discrimination.'" *Hawkins* at ¶ 11, quoting *Frazier* at ¶ 64. "In step three, the trial court may not simply accept a proffered race-neutral reason at face value, but must examine the prosecutor's challenges in context to ensure that the reason is not merely pretextual." *Frazier* at ¶ 65. When assessing "whether the State's race-neutral reasons for using a peremptory challenge to strike a potential juror from the venire are merely pretextual," a court should consider:

> "(1) the bare statistics; (2) the similarity of answers to voir dire questions by African-American jurors who were peremptorily challenged and answers by non-African-American prospective jurors who were allowed to serve; (3) broader patterns of practice, including jury shuffling; (4) disparate questioning of African-American and non African-American jurors; and (5) evidence that the prosecutor's office has historically discriminated against African-Americans in jury selection."

*Hawkins* at ¶ 17, quoting *State v. Smith*, 12th Dist. Butler No. CA2009-02-038, 2010-Ohio-1721, ¶ 87. "'[T]he rule in *Batson* provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it.'" *Frazier* at ¶ 65, quoting *Miller-El v. Dretke*, 545 U.S. 231, 251-252, 125 S.Ct. 2317 (2005). "However, * * * trial court[s] [are] not compelled to make detailed factual findings

to comply with *Batson*." *Id.* at ¶ 98. "If the trial court determines that the proffered reason is merely pretextual and that a racial motive is in fact behind the challenge, the juror may not be excluded." *Id.* at ¶ 65.

**{¶72}** In this case, Jones challenged the State's use of two peremptory challenges to strike the only two black jurors on the panel. In particular, during voir dire, the State exercised its peremptory challenges and excused four jurors: M.U. (a 46-year-old black male), Ja.B. (a 67-year-old white male), Ju.B. (a 68-year-old black female), and K.D. (a 53-year-old white female). (*See* Jan. 30-31, 2023 Tr., Vol. I. at 180); (Juror Questionnaires Nos. 71, 536, 853, 943). Following the State's use of its peremptory challenges, Jones challenged the State's decision to excuse M.U. and Ju.B. under *Batson*. Specifically, Jones argued that, since the main issues include "two relatively politically charged issues; * * * one is gun laws and one is drug laws," the State's decision to excuse the black jurors appeared to be racially motivated. (Jan. 30-31, 2023 Tr., Vol. I. at 170-171). That is, Jones alleged that the State excused "the only two black jurors who were either on the panel or likely to be on the panel" for expressing concerns regarding marijuana laws but did not excuse the potential white jurors who expressed opinions regarding gun laws. (*Id.*).

**{¶73}** In response to Jones's challenge, the State asserted its race-neutral reasons for exercising its peremptory challenges against M.U. and Ju.B.:

> [The State]:  The only two people to voice that they had strong opinions on the drug laws * * * were [M.U. and Ju.B.].

[M.U.] said that he thought the laws were B.S. and that * * * marijuana should be regulated much like alcohol.

[Ju.B.] was in agreement with that. Although they did say they would follow the law, obviously there are still concerns when someone feels that strongly about things.

As far as the gun laws * * * there were a couple of gentlemen in the back who did state that they had strong feelings on gun laws. * * * They began talking about ATF overreaching and bump stocks and all things that don't really apply to this case and really have nothing to do with this case.

(*Id.* at 175). In sum, the State argued that, "where the two that are being challenged on the *Batson* challenge were excused[,] their strong feelings were directly on point with a charged count in this [case]. Whereas, the gun laws were more kind of an issue that we don't have here." (*Id.*). Moreover, the State proffered that it learned (during voir dire) that Ju.B.'s son has felony drug-trafficking convictions. (*See id.* at 175-176).

{¶74} Thereafter, the trial court denied Jones's *Batson* challenge after concluding that the State provided "non discriminatory reasons" for dismissing M.U. and Ju.B. (*Id.* at 183).

{¶75} On appeal, Jones does not argue either that the trial court erred by finding that he established a prima facie case of discrimination or that the State did not offer race-neutral justifications for exercising its peremptory challenges to excuse M.U. and Ju.B. Instead, Jones's argument turns solely on whether the trial

-41-

court properly conducted the third step of a *Batson* inquiry. Consequently, we will limit our analysis to only that issue. *Accord Hawkins*, 2018-Ohio-4649, at ¶ 16.

**{¶76}** Here, Jones argues that the State's race-neutral reasons for excusing M.U. and Ju.B. were merely pretextual because "[o]f the five total jurors who expressed political misgivings about the policies underpinning gun and drug possession crimes, the state struck 100% of the black jurors and 0% of the white jurors" and "[o]nly one inference explains such disparate treatment—the state harbored a discriminatory intent." (Appellant's Brief at 26). More specifically, Jones contends that the State's reasons for dismissing the potential black jurors were pretextual because the State did not further probe the jurors' "Second Amendment opinions about handgun possession within the home." (*Id.* at 27). That is, Jones suggests that "if the state's true concern was for a juror's political views, and not his or her race, it could have struck two of the three white jurors whose political views suggested antipathy towards [sic] gun possession criminalization" but that, "[i]nstead, it struck two jurors who expressed no political bias whatsoever." (*Id.*).

**{¶77}** The State counters Jones's argument and maintains that its "race neutral reasons were appropriate" because M.U. and Ju.B. "were both animated in their demeanor" "when asked about the legality of marijuana" and because Ju.B.'s son "had a conviction for drug trafficking." (Appellee's Brief at 26-27). Moreover, the State disputes Jones's "attempt to compare the answers of" M.U. and Ju.B. "about drug crimes to those of three white jury members who had strong opinions

about firearm regulations" and asserts that it "distinguished between the jurors who thought the marijuana laws are 'B.S.' and the jurors who disliked a proposed federal regulation that had no bearing on the case." (*Id.* at 27-28).

{¶78} Based on our review of the record, we conclude that the trial court's rejection of Jones's *Batson* challenge is not clearly erroneous. Unquestionably, there is no evidence in the record that the State engaged in jury shuffling or that the Allen County prosecutor's office has historically discriminated against potential black jurors in the jury-selection process. *Accord Hawkins*, 2018-Ohio-4649, at ¶ 18 (concluding that "[t]he State did not employ practices such as jury shuffling during the selection of Hawkins's jury, and there is no evidence that the Allen County prosecutor's office has historically discriminated against black potential jurors in the jury-selection process"). Likewise, there is no evidence in the record of disparate questioning of potential black or non-black jurors. *See id.* ("Moreover, an examination of the transcript of the entire voir dire process does not reveal that the State systematically asked black potential jurors different questions—either in tone or in substance—than it asked non-black potential jurors.").

{¶79} Furthermore, there is no evidence in the record that the "bare statistics" support a *Batson* challenge. Importantly, the record in this case reveals that the absence of African Americans on Jones's jury resulted from few African Americans randomly selected for the original jury pool. *Accord Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, at ¶ 69. *See also Smith*, 2010-Ohio-1721, at ¶ 89 ("The

lack of African-American jurors could very well be the result of so few African-American jurors being randomly selected for the original jury pool."). Indeed, even though no black jurors served on the jury in this case because the State excused the only prospective black jurors, the statistical disparity is clarified by the balance of the remaining evidence. *Compare State v. Hunter*, 2d Dist. Montgomery No. 22201, 2008-Ohio-2887, ¶ 19 (concluding that the "bare statistics" did not support an inference that the "only two prospective jurors who were African-American" were excused because of their race when "no African-American jurors served on the jury").

{¶80} Notwithstanding Jones's suggestion of "similarities" between M.U. and Ju.B. and three white potential jurors who ultimately served on the jury in Jones's trial, we conclude that any such alleged similarities do *not* definitively show that the State's race-neutral reasons for excusing M.U. and Ju.B. were pretextual. *See Hawkins* at ¶ 22. "'If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step.'" *Frazier* at ¶ 71, quoting *Miller-El*, 545 U.S. at 241. *See also State v. Lacey*, 7th Dist. Mahoning No. 10 MA 122, 2012-Ohio-1685, ¶ 128 ("'[A] prosecutor's explanation for striking an African-American juror does not pass muster where a similarly situated Caucasian juror was not stricken.'"), quoting *State v. Belcher*, 89 Ohio App.3d 24, 33-34 (10th Dist.1993). "However, while courts

-44-

can consider the extent to which the State's race-neutral reasons also apply to potential jurors against whom the State did not exercise peremptory challenges, such similarities are not necessarily conclusive proof that the State's proffered race-neutral justifications are pretextual." *Hawkins* at ¶ 25. "Instead, such similarities are just one fact to be considered by the trial court in determining the plausibility of the State's race-neutral reasons 'in light of all evidence with a bearing on it.'" *Id.*, quoting *Miller-El* at 252.

**{¶81}** In this case, the similarities between M.U. and Ju.B. and the other potential jurors who eventually served on the jury in Jones's trial do not demand a finding of pretext, especially considering the relevant differences between M.U. and Ju.B. and other jurors as well as the additional factors negating an inference of discrimination. Decisively, there was a meaningful, race-neutral difference between Ju.B. and the other jurors. *See id.* at ¶ 22. That is, Ju.B.'s son was convicted of felony-drug trafficking. *See State v. Mitchell*, 7th Dist. Mahoning No. 14 MA 0119, 2016-Ohio-1439, ¶ 27 ("""Removing a juror based on the past criminal history of him or her, or his or her family member, is a valid, race-neutral reason for raising a peremptory challenge"""), quoting *Lacey* at ¶ 127, quoting *State v. Santiago*, 10th Dist. Franklin No. 02AP-1094, 2003-Ohio-2877, ¶ 10.

**{¶82}** Furthermore, we reject Jones's contention that the State's reason for excusing M.U. (based on his belief regarding the legality of marijuana) was improper because three potential white jurors expressed political misgivings

regarding gun laws but were not peremptory challenged. Indeed, our probe into the State's explanation for excusing M.U. (and not the three potential white jurors) reveals significant differences between M.U.'s beliefs regarding marijuana laws and the potential white jurors' beliefs regarding gun laws. *Compare Lacey* at ¶ 129 (concluding that "[t]he record reveal[ed] significant differences between Mr. [G] and the other juror's responses during voir dire"). In other words, M.U. and the three potential white jurors were not similarly situated.

{¶83} Relevantly, during voir dire, M.U. stated that he "think[s] the laws on marijuana is [sic] B.S." in response to the State's question to the venire regarding whether anyone had "strong feelings on drug laws." (Jan. 30-31, 2023 Tr., Vol. I, at 56). That is, M.U.'s beliefs regarding marijuana laws were directly related to an issue central to Jones's case. By contrast, the three potential white jurors expressed concerns with general governmental overreach—namely, the three potential white jurors expressed concerns pertaining to a recent ATF rule regarding bump stocks— in response to the State's question to the venire regarding whether anyone had "any strong feelings on gun laws." (*Id.* at 61). Critically, the State (and the trial court) responded to the three potential white jurors' concerns by stating that "this case doesn't involve the ATF or anything" and "that's not what this case is," which dispelled those potential jurors' concerns. (*Id.* at 63-64).

{¶84} Evaluating whether the State's reasons for excusing M.U. were pretextual, the trial court noted that it "listen[ed] to the questions that were asked,"

"[t]he reactions of the different jurors," and "[t]he things they said." (*Id.* at 181). *See Prieto*, 2016-Ohio-8480, at ¶ 55 ("The trial court was in the best position to evaluate the statements of the prosecutor and also those made by the juror during voir dire."). Specifically, the trial court judged that M.U. had "a more animated demeanor when asked about the marijuana, drugs" and "his "feelings of it." (Jan. 30-31, 2023 Tr., Vol. I, at 181-182). Meanwhile, the trial court acknowledged the three potential white jurors' concerns with gun laws and analyzed that "[t]here were some people who were quite animated over certain aspects," including "when it came to guns. In fact, the three gentlemen in the back row were fairly animated about guns. But, again, as they proceeded it was more like the ATF overstepping and things like that more, more federal regulations type thing * * * ." (*Id.* at 181).

{¶85} Consequently, our review of the record reveals that, unlike the sitting jurors, M.U. expressed disdain for an issue *central* to the disposition of Jones's case. Thus, when considering the content underlying the three potential white jurors' concerns, the State's explanation for excusing M.U. was race neutral and is supported by the record.

{¶86} As a result, any similarities between M.U. and Ju.B. and non-black prospective jurors who were seated on the jury do not reflect that the State's race-neutral reasons for striking M.U. and Ju.B. were pretextual. Therefore, we conclude that the State's reasons for exercising its peremptory challenges against M.U. and Ju.B. were race neutral. That is, "we are not left with a definite and firm conviction

that the trial court mistakenly credited the State's race-neutral reasons for exercising a peremptory challenge against" M.U. and Ju.B. *Hawkins*, 2018-Ohio-4649, at ¶ 28. Accordingly, the trial court's decision rejecting Jones's *Batson* challenge is not clearly erroneous. *Accord id.*; *Prieto* at ¶ 55.

**{¶87}** Jones's fourth assignment of error is overruled.

**{¶88}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgments of the trial court in case numbers CR2021 0224 and CR2022 0271, assigned appellate case numbers 1-23-18 and 1-23-17, respectively.

*Judgments Affirmed in Case Numbers 1-23-17 and 1-23-18*

*Appeal Dismissed in Case Number 1-23-19*

**MILLER and GWIN, J.J., concur.**

**/hls**

**\*\*Judge W. Scott Gwin of the Fifth District Court of Appeals, sitting by Assignment of the Chief Justice of the Supreme Court of Ohio.**